IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| DON YORK, *et al.*, | ) |
| Plaintiffs, | ) ) ) |
| v. | ) No. 21-03251-CV-S-BP |
| NORTHROP GRUMMAN CORPORATION GUIDANCE AND ELECTRONICS COMPANY, INC., *et al.*, | ) ) ) ) ) |
| Defendants. | ) ) |

### ORDER (1) GRANTING DEFENDANTS' MOTION TO DISMISS, (2) PERMITTING PLAINTIFFS TO FILE SECOND AMENDED COMPLAINT, AND (3) DENYING DEFENDANTS' MOTION TO STRIKE AS MOOT

Pending are Defendants' (1) Motion to Dismiss and (2) Motion to Strike Class Allegations. The Court has considered the parties' written arguments, the arguments they presented at the hearing on May 5, 2022, and the supplemental filing Plaintiff submitted on May 6. As set forth below, (1) the Motion to Dismiss, (Doc. 28), is **GRANTED,** (2) Plaintiffs are directed to file a Second Amended Complaint or face entry of final judgment, and (3) the Motion to Strike (Doc. 27), is **MOOT**.

### I. BACKGROUND

This case arises from the operations of Litton Systems Inc., ("Litton"), at its manufacturing facility in Springfield, Missouri, ("the Site"). Litton began manufacturing printed circuit boards at the Site in the 1960s, and part of the process involved the use of tricholorethyline, ("TCE"), which is a carcinogen. Litton's method for containing the TCE proved unsuccessful, and in 1982 the State of Missouri filed suit. That suit was settled, with Litton paying a fine and being required to engage in various efforts to remediate the contamination. The settlement also required Litton to construct a network of monitoring and extracting wells to be placed under the State's oversight.

(Doc. 20, ¶ 38.) At the time, there was no indication that any private wells had been contaminated, although it was understood that contamination could occur if the TCE was not contained and seepage continued. (*See* Doc. 20, ¶ 36.)

In 1990 or 1991, contamination was discovered on the Site, which was then reported to the State. (Doc. 20-10, ¶¶ 9-10.) This led the State and Litton to enter a Consent Agreement in 1993. (Doc. 20-10, ¶ 12.) The 1993 Consent Agreement is not in the Record, but it is described as "contemplat[ing] ongoing work and future disputes between" the State and Litton. (Doc. 20, ¶ 12.)[1]

Defendants acquired the Site in 2001 and assumed Litton's responsibilities under the prior settlements with the State (including the 1993 Consent Agreement). In December 2010, the State sued Defendants in this Court, seeking relief under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, ("CERCLA"), 42 U.S.C. § 9601, *et seq*, alleging in part that contamination had spread from the Site to adjoining properties. The 2010 case is captioned *State of Missouri v. Northrop Grumman Guidance & Electronics Co.*, No 10-4268-CV-C-DGK and was resolved via entry of a Consent Decree and Settlement, ("the Consent Decree").[2] The Consent Decree, (Doc. 28-2), is lengthy and is not susceptible to easy summary. The Consent Decree incorporates the terms of a separate Scope of Work, (Doc. 28-3), which is also quite detailed and defies easy summary. The Court will discuss specific terms as necessary; however,

---

[1] The 1993 Consent Agreement was not attached to the Amended Complaint, although the Court could consider it because it is fairly embraced by the pleadings or (assuming the Consent Agreement was issued as part of a prior judicial proceeding) because it is amenable to judicial notice. *E.g., Podraza v. Whiting,* 790 F.3d 828, 833 (8th Cir. 2015) (judicial notice); *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151(8th Cir. 2012) (fairly embraced). Defendants contend that the 1993 Consent Agreement is not relevant to the present case; the Court is not yet convinced, but there is no need to fully explore the matter in light of the Court's ruling.

[2] As discussed in the preceding footnote, the Court may refer to events and documents from that case even if they have not been included as part of the Amended Complaint because they are amenable to judicial notice. Where documents from that case have been submitted as exhibits in this case, the Court will refer to the docket entry in this case.

for present purposes it is sufficient to note that the Consent Decree reflects the parties' agreement that the 1993 agreement was no longer adequate. (Doc. 28-2, p. 8.)[3] The Consent Decree also:

- Summarized the work that had been done at the site by Litton and Defendants under the supervision of the Missouri Department of Natural Resources, ("DNR"), Doc. 28-2, pp. 5-8);
- Stated that the work Defendants was required to perform pursuant to the Consent Decree and the Scope of Work "shall constitute a response or action taken or ordered by the State" in accordance with CERCLA, (Doc. 28-2, p. 9);
- Acknowledged that the Scope of Work did not include "a Feasibility Study for groundwater or implement[ ] a remedy for impacted groundwater" but provided that Defendants would nonetheless conduct a Feasibility Study and the parties would either enter an additional agreement or amend the Scope of Work, (Doc. 28-2, p. 17);
- Required Defendants to submit reports (including quarterly progress reports) to DNR, (Doc. 28-2, pp. 22-23); and
- Established provisions related to access and work on property not owned by Defendants where work needed to be done, (Doc. 28-2, pp. 24-30).

The Scope of Work establishes that its purpose is to "set forth requirements for implementation of on-site and if necessary, off-site remedial action" related to the Site. (Doc. 28-3, § 1.1.) The Consent Decree and Scope of Work were publicized to permit public comment, as required by

---

[3] All page numbers are those generated by the Court's CM/ECF system.

CERCLA. (*See* Doc. 28-2, p. 18; Case 10-4268, Doc. 11, p. 1.) After the public comment period concluded, the Court entered the Consent Decree in June 2011.[4]

In 2016 or 2017, DNR conducted tests at a tourist attraction known as "Fantastic Caverns" and discovered TCE vapor had seeped into the cave system. (Doc. 20, ¶ 46.) In 2018, DNR began testing wells around the Site and discovered some had been contaminated with TCE. DNR then offered free testing to property owners near the Site, which resulted in more positive tests. (Doc. 20, ¶¶ 47-50, 53-56.) "Where tests have found TCE in private wells, DNR and Defendants have scheduled either quarterly or monthly follow ups to continue testing the wells." (Doc. 20, ¶ 51.)

Plaintiffs are individuals who own or lease property in Springfield, Missouri. Don and Beverly York purchased their property in 2006; their daughter and husband are tenants on the property. Plaintiffs Jack and Judy Harvey purchased their property "over 20 years ago," (Doc. 20, ¶ 85), which suggests approximately 2001 or 2002. The well water on the Plaintiffs' properties is contaminated with TCE, which impacts Plaintiffs in a variety of ways, including health concerns and potential difficult selling the properties. Plaintiffs learned that their well water was contaminated in 2018, (Doc. 20, ¶ 80-81, 85); according to Plaintiffs, DNR did not test their wells until 2018 because (1) DNR thought their property received water service from the city and did not use well water and (2) DNR "assumed" that the flow of water below Plaintiff's property flowed in a direction that would not have brought TCE to their property. (Doc. 20, ¶ 68.)[5]

---

[4] The 2010 case was presided over by, and the Consent Decree was approved by, the Honorable Greg Kays.

[5] Defendants have provided Plaintiffs with filtration systems, but the filtration system "change[s] the taste of the water which Plaintiffs now find less enjoyable than their well water" and requires Defendants to enter the property to replace the carbon used in the filtration system. (Doc. 20, ¶ 95-97.) Defendants also discussed the Plaintiffs' properties with DNR and Plaintiffs and expressed a desire to conduct testing and consider additional remedial efforts, but Plaintiffs describe this testing as "intrusive" and indicate a preference for Defendants to simply buy their properties. (Doc. 20, ¶¶ 72-78.)

4

The Amended Complaint asserts four claims.[6] Count I asserts a claim of negligence premised on three discrete theories:

- "Failing to effectively monitor the spread of TCE from the" Site,
- "Failing to warn others that TCE spread from the" Site, and
- Negligently operating or remediating the Site "in a manner that permitted TCE [to] spread from the" Site.

(Doc. 20, ¶ 163.) Count II asserts a claim for temporary nuisance arising from "Defendants' intentional, willful and wanton, or negligent conduct in failing to prevent the spread of TCE from the" Site to Plaintiffs' property. (Doc. 20, ¶ 180; *see also* Doc. 20, ¶¶ 179, 183.) Count III is a claim for continuing nuisance that "arises from Defendants' decades-long mismanagement of the [Site], which includes failure to prevent the spread of TCE from the site and failure to warn." (Doc. 20, ¶ 190.) Finally, Count IV is a claim for trespass because Plaintiffs "fail[ed] to stop the spread of TCE . . . ." (Doc. 20, ¶ 200.)

For relief, in addition to damages, Plaintiffs seek injunctive relief that appears to take two forms. First, they seek an injunction requiring Defendants "to properly remediate the [S]ite, remediate all areas in which TCE from the Site has spread, and prevent the further spread of TCE into Springfield." (Doc. 20, ¶ 213.) Second, they ask the Court to order Defendants to create a trust fund to pay for medical monitoring for all class members. (Doc. 20, ¶ 225.)

Defendants seek dismissal, primarily contending that Plaintiffs' claims are preempted because they conflict with the Consent Decree. Plaintiffs responded to the motion, arguing that there is no conflict. Then, at the hearing, Plaintiffs described their case as one primarily premised

---

[6] There is a fifth count which only asks for injunctive relief. Defendants correctly observe that injunctive relief is a remedy and not a cause of action. The Court interprets Count V in this manner; it represents Plaintiffs' request for injunctive relief should Plaintiffs prevail on one of the other four Counts and is not a free-standing claim.

5

on Defendants' alleged failure to publicly announce that they discovered a contaminated well in 2004. Plaintiffs' description at the hearing was clearer, more detailed, and inarguably different than the claims asserted in the Amended Complaint. While there are scattered allegations about Defendants' failure to announce its discovery about the spread of contamination, (*e.g.,* Doc. 20, ¶ 105-06, 111-14, 132), the Amended Complaint does not clearly allege when or how Defendants obtained this information, and the allegations tend to be about the spread of contamination generally as opposed to specific allegations about contaminations in wells. The Amended Complaint also seems to place the blame for this failing on DNR. (*E.g.*, Doc. 20, ¶¶ 71, 131.) Relatedly, the claims asserted in the Amended Complaint are much broader than what Plaintiffs now represent as their core contention, as is the nature of the relief sought and the basis for class certification. (Doc. 20, ¶ 147.)[7] In this way, what Plaintiffs described at the hearing as their primary claim is vaguely referenced in, but is not clearly discernible from, the Amended Complaint. Notwithstanding Plaintiffs' refinement of their claims (which the Court will address later in this Order), the Court must resolve the parties' arguments as they relate to the Amended Complaint as it is written. The Court resolves those arguments below.

## II.  DISCUSSION

Under Rule 12(b)(6), the Court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the Plaintiff[ ]." *Stodghill v. Wellston School Dist.*, 512 F.3d 472, 476 (8th Cir. 2008); *see also Alexander v. Hedback*, 718 F.3d 762, 765 (8th Cir. 2013).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

---

[7] Plaintiffs seek certification of four classes, (Doc. 138-42), but the Court need not discuss these aspects of the Amended Complaint.

> draw the reasonable inference that the defendant is liable for the misconduct
> alleged. The plausibility standard is not akin to a probability requirement, but it
> asks for more than a sheer possibility that a defendant has acted unlawfully. Where
> a complaint pleads facts that are merely consistent with a defendant's liability, it
> stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted). A claim is facially plausible if it allows the reasonable inference that the defendant is liable for the conduct alleged. *E.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Horras v. American Capital Strategies, Ltd.*, 729 F.3d 798, 801 (8th Cir. 2013). Finally, dismissal based on an affirmative defense is permissible if the Complaint establishes that the defense exists. *E.g., C.H. Robinson Worldwide, Inc. v. Lobrano,* 695 F.3d 758, 763-64 (8th Cir. 2012).

### A. CERCLA and Conflict Preemption

As stated earlier, the Consent Decree issued by Judge Kays was in response to DNR's suit against Defendants under CERCLA. CERCLA "seeks to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts are borne by those responsible for the contamination" and sets up a detailed scheme for addressing contamination before a plan to remediate the waste is adopted; "but once a plan is selected, the time for debate ends and the time for action begins." *Atlantic Richfield Co. v. Christian*, 140 S. Ct. 1335, 1345-46 (2020) (cleaned up). CERCLA achieves these objectives in a myriad of ways; as relevant here, CERCLA encourages a responsible party to enter a consent decree by providing that the settling party cannot be sued to require it to do something other than what is required by the consent decree, nor can it be subjected to suit because the response called for by the consent decree is inadequate.[8] Such a consent decree has the effect of federal law, and state laws (including state claims) that conflict

---
[8] Another way that CERCLA encourages a responsible party to settle is by providing that if a party enters a consent decree, that party "shall not be liable for claims of contribution [from other potentially responsible parties] regarding matters addressed in the settlement." 42 U.S.C. § 9613(f)(2).

7

with the consent decree are preempted. Claims based on the purported inadequacy of the response called for by the settlement are preempted; courts have also concluded that claims for damages resulting from (1) actions required by a consent decree or (2) the failure to do more than is required/permitted by the consent decree are preempted.

This feature of CERCLA derives from 42 U.S.C. § 9622(e)(6), which provides that once a consent decree is entered, "no potentially responsible party may undertake any remedial action" that is not authorized by the consent decree. Courts have uniformly interpreted this provision as prohibiting the settling party from taking any action not specified in the consent decree, and that state claims that conflict with a consent decree are preempted. As a general matter, "conflict preemption exists where compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quotations omitted). Because remedial actions other than those set forth in the consent decree are barred as a matter of law, courts have consistently held that § 9622(e)(6) preempts state claims based on assigning liability to the settling party because it did not do something more or different than what was required in the decree or that would require the settling party to take additional actions not required by the consent decree.

For instance, in *Bartlett v. Honeywell Int'l, Inc.*, 260 F. Supp. 3d 231 (N.D.N.Y. 2017), *aff'd*, 737 Fed. App'x 543 (2d Cir. 2018), the defendant entered a consent decree with the EPA and the New York State Department of Environmental Conservation in 1993; the consent decree was later amended in 2007. *Bartlett*, 260 F. Supp. 3d at 234. The plaintiffs filed suit in 2013 and their amended complaint alleged that the defendant (1) failed to use reasonable care in implementing and choosing the remediation methods, (2) maintained a dangerous condition on its

8

property that constituted a nuisance, and (3) caused toxic chemicals to "land[ ] on [the p]laintiffs' real property and persons." *Id*. at 235. The court observed that "[a] number of courts have held that consent decrees entered into pursuant to environmental laws sufficiently conflict with state law to warrant preemption," and cited examples. *Id*. at 240-41. And based on those cases, the court explained that state claims that required defendant to take different actions than those specified in the consent decree were preempted. The court further held that because the consent decree required the defendant to take those actions and prohibited it from taking any other actions, the defendant could not be liable for any damages that ensued so long as the defendant acted in conformity with the consent decree. Thus, a claim for damages was preempted "if the allegedly tortious activities (1) were required, directed or supervised by the [governmental entity], and (2) were performed properly." *Id*. at 243. The court then held "that each of [the plaintiff's] claims is based exclusively on the premise that [the d]efendant should have conducted a more robust cleanup effort than the Consent Decree mandated," *id*., and held that the claims were therefore preempted.

The Second Circuit affirmed the district court's decision in *Bartlett*. In doing so it agreed that the plaintiff's claims "challenge the adequacy of the consent decree . . . and not its implementation" and were thus preempted. *Bartlett*, 737 Fed. App'x at 549-50. In particular, the "state claim arising from [the defendant's] purported negligence in failing to conduct additional . . . . tests" was preempted because the claim sought to impose liability for defendant's failure to do something that it was not required to do. *Id*. at 551 (citing *New Mexico v. General Elec. Co.*, 467 F.3d 1223, 1249-50 (10th Cir. 2006)).

A similar result was reached in *Town of Halfmoon v. General Elec. Co.*, 105 F. Supp. 3d 202 (N.D.N.Y. 2015). There, the plaintiffs alleged that the defendant's actions – all of which were in conformity with a consent decree – caused them harm. As the District Court explained, it was

9

impossible for the defendant to comply with the consent decree without subjecting itself to liability because the plaintiff asserted damages arising from the remediation efforts called for by the consent decree, so the state claims were preempted. *Town of Halfmoon*, 105 F. Supp. 3d at 217-18. Other cases applying this reasoning and reaching the same result based on § 9622(e)(6) include *Salerno v. City of Niagara Falls*, 2020 WL 5814406, at *4 (W.D.N.Y. Sep. 30, 2020) and *Coastline Terminals of Connecticut, Inc. v. USX Corp.*, 156 F. Supp. 2d 203, 208-09 (D. Conn. 2001).

In addition, because CERCLA provides the EPA and the states a variety of means for addressing environmental contamination, courts have generally held that once a remedy is imposed by the EPA or the state by any means (not just consent decrees), the responding party is insulated from claims based on the response. *E.g., New Mexico v. General Elec. Co.*, 467 F.3d 1223, 1250 (10th Cir. 2006) (discussing 42 U.S.C. § 9613(h) and holding that the claims asserted "might place [defendants] in the unenviable position of being held liable for monetary damages because they are complying with an EPA-ordered remedy which [the defendants] have no power to alter without prior EPA approval.") *see also Cavallo v. Star Enterprise*, 100 F.3d 1150, 1156-57 (4th Cir. 1996) (applying similar analysis to consent decree issued to resolve claims under the Resource Conservation & Recovery Act); *Feikema v. Texaco, Inc.*, 16 F.3d 1408, 1416 (4th Cir. 1994) (same).

Plaintiffs do not directly contest the reasoning of these cases or cite contrary authority. Instead, they observe that CERCLA contains a savings clause providing that CERCLA does not "affect or modify in any way the obligations or liabilities of any person under other Federal or State law, including common law, with respect to releases of hazardous substances or other pollutants or contaminants." 42 U.S.C. § 9652(d). Another provision states that CERCLA is not to be "construed or interpreting as preempting any State from imposing any additional liability or

10

requirements with respect to the release of hazardous substances within such State." *Id*. § 9614(a). These provisions have persuaded courts to hold that CERCLA does not preempt the entire field of environmental regulation or preempt state causes of action arising from the discharge of hazardous waste. But the Supreme Court recently made clear, in discussing both the saving clauses and § 9622(e)(6), that "we have long rejected interpretations of sweeping saving clauses that prove absolutely inconsistent with the provisions of the cast in which they are found. Interpreting [CERCLA]'s saving clauses to erase the clear mandate of [§ 9622(e)(6)] would allow [CERCLA] to destroy itself." *Atlantic Richfield*, 140 S. Ct. at 1355. Thus, courts have relied on the saving clauses to hold that CERCLA does not occupy the field of environmental regulation and litigation and that state causes of action are not generally preempted – but issues of conflict preemption are different and are not affected by the saving clauses, because conflict preemption addresses whether a specific claim for relief conflicts with a consent decree. *E.g. New Mexico*, 467 F.3d at 1243-44; *Salerno*, 2020 WL 5814406, at *4; *Bartlett*, 26 F. Supp. 3d at 239.

Consistent with the principles (and the decisions) discussed above, the Court concludes that Plaintiffs' claims are preempted to the extent that they seek

1. equitable relief requiring Defendants to undertake efforts different from or in addition to those set forth in the Consent Decree,
2. damages because Defendants failed to do something that was not required by the Consent Decree, or
3. damages because Defendants did something required by the Consent Decree, so long as there is not also a claim that Defendants performed that task improperly or negligently.

On the other hand, Plaintiffs' claims are not preempted to the extent that they

1. allege that Defendants negligently performed the tasks required by the Consent Decree, or

2. arise from Defendants' actions that were not required by the Consent Decree.

## B. Application of Conflict Preemption Principles to the Amended Complaint

Plaintiffs present several arguments contending that even if claims and requests for relief that conflict with the Consent Decree are preempted, *their* claims and requests for relief do not conflict with the Consent Decree. The Court does not find Plaintiffs' arguments to be persuasive.[9]

### *1. Geographic Limits*

Plaintiffs contend that their claims do not conflict with the Consent Decree because the Consent Decree is limited to what happens at the Site and their claims involve activity away from the Site. (Doc. 29, p. 12.) The Court disagrees for two reasons. First, even if Plaintiffs' characterization of the Consent Decree is correct, some of their claims arise from their allegations that Defendants failed to remediate the Site; moreover, they seek injunctive relief requiring Defendants to remediate the Site. (*E.g.*, Doc. 20, ¶¶ 162, 163.1, 180, 183, 190, 200, 213.) Second, and more importantly, Plaintiffs' characterization of the Consent Decree's scope is incorrect. They point to one of the recitals in the Consent Decree's section entitled "Background," which states that the "Consent Decree pertains to the" Site. (Doc. 28-2, p. 4.) This bare statement in the Background section merely describes what the Consent Decree relates to by identifying the contaminated property giving rise to the claims and does not limit (or even define) the Consent Decree's scope. To the contrary, the Consent Decree specifically states that it is being entered

---

[9] At the hearing, Plaintiffs posited a new theory: that the damages they complain of stem from the original release(s) by Litton prior to 1982. They contend that the spread of TCE was inevitable and could not have been prevented by any remedial means. In framing their claims in this manner, Plaintiffs hope to avoid any conflicts with the Consent Decree. However, in contrast with their claim that Defendants failed to warn of facts known to them in 2004, there are no vestiges of such a theory in the Amended Complaint (or, for that matter, in their response to the Motion to Dismiss). To the contrary: the Amended Complaint's allegations are entirely inconsistent with this theory in that the Amended Complaint alleges (in multiple paragraphs) that Defendants are liable for failing to prevent the spread of TCE. This theory is also arguably inconsistent with Plaintiffs' theory that Defendants learned something "new" in 2004 that they were required to disclose. Because the Amended Complaint does not present this theory, there is no need for the Court to fully consider its legal viability.

because DNR "determined that additional work is necessary *beyond the Settling Defendant's property boundaries*," (Doc. 28-2, p. 8) (emphasis supplied), and includes provisions for conducting work on property belonging to third parties. (*E.g.*, Doc. 28-2, pp. 17, 24-28.)

### 2. Plaintiffs' Requests for Injunctive Relief

As established above, any requests for injunctive relief that would require Defendants to do something more or different than required by the Consent Decree are preempted. Plaintiffs insist that they "do not seek cleanup, removal, or remedial action within the Site," (Doc. 29, p. 13), but the Amended Complaint contains several paragraphs seeking exactly that. (*E.g.*, Doc. 20, ¶ 213.) However, any such request is excluded from this case, either because Plaintiffs are now disclaiming any such request or because such relief would be preempted.

To the extent that Plaintiffs seek remedial action on their properties and at other locations outside the Site, such requests for injunctive relief are also preempted. As discussed, the Consent Decree establishes Defendants' obligations to remediate damage caused by hazardous waste from the Site – including damage to Plaintiffs' (and others') properties. Therefore, in asking for an injunction requiring Defendants to remediate hazardous waste on their (and others') properties, Plaintiffs seek relief that conflicts with the Consent Decree.

### 3. Plaintiffs' Requests for Monetary Damages

Plaintiffs' requests for damages are also largely preempted because Plaintiffs do not allege that Defendants failed to perform, or negligently performed, their obligations under the Consent Decree. As noted earlier, damage claims are preempted if the allegedly tortious activities (1) were required by the Consent Decree and were performed properly or (2) constitute a claim that Defendants should have done something that was not required by the Consent Decree. *Bartlett*, 260 F. Supp. 3d at 243 (citing *Cavallo*, 100 F.3d at 1156). But with two exceptions – one of which

13

will be discussed in the next paragraph and the other of which will be addressed in Part II(B)(4), below – Plaintiffs do not contend that the Amended Complaint alleges any tortious activities that were (1) not required by the Consent Decree or (2) that were required by the Consent Decree but performed improperly, so Plaintiffs have failed to assert any claims that do not conflict with the Consent Decree. *E.g., Bartlett*, 260 F. Supp. 3d at 243.

One of the exceptions involves various assertions that Defendants negligently fulfilled their obligations under the Consent Decree. (*E.g.*, Doc. 20, ¶¶ 147(a), 147(b), 147(c), 147(f), 163(1), 163(3), 165, 180.) However, while claims that Defendants negligently performed their responsibilities under the Consent Decree would not be preempted, Plaintiffs do not identify any obligations imposed by the Consent Decree that were negligently performed, nor do they allege how Defendants negligently fulfilled their obligations. In this way, Plaintiffs' bare statements Defendants negligently performed their obligations are legally insufficient because "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

### *4. Failure to Disclose, Damages Therefrom, and Medical Monitoring*

As stated earlier, Plaintiffs have seemingly disclaimed the full breadth of the claims asserted and relief sought in the Amended Complaint. Instead, Plaintiffs focus on their claim that Defendants should have publicly announced in 2004 that they discovered contamination in a private well. For relief, Plaintiffs seek compensation for any improvements they made on their properties after the information should have been disclosed and a fund to provide for medical monitoring. The Court will address this aspect of the "failure to disclose" theory in Part II(C), below; here, the Court addresses the theory as it is plead in the Amended Compliant.

The Court concludes that the "failure to disclose" theory does not state a claim. At a minimum, Defendants' failure to disclose facts clearly does not support Counts II, III or IV. Assuming a duty to reveal information exists, a breach of such duty is not, and did not contribute to or cause, the nuisance or trespass alleged in the Amended Complaint. What Plaintiffs are claiming is that Defendants did not tell them about the nuisance or trespass – but the failure to disclose is not, in and of itself, the nuisance or trespass.

At most, Plaintiffs' theory is legally viable under Count I, and then only to the extent that Count I alleges that Defendants owed "a duty to warn others should TCE spread from the" Site. (Doc. 20, ¶ 160.) In that regard, the Amended Complaint does not make clear (1) what Defendants should have announced, (2) when Defendants should have made the announcement, (3) whether the facts that should have been reported were matters the Defendants allegedly "knew" or matters Defendants allegedly "should have known," or (4) the factual underpinning for Defendants' knowledge. In short, as asserted in the Amended Complaint, Plaintiffs' "failure to disclose" theory in Count I is too vague to survive Defendants' motion.

### C.  Plaintiffs' Request for Leave to Amend the Pleadings

As noted earlier, while the Amended Complaint contains references to events in 2004, Plaintiffs' focus on those events as the basis for their failure to disclose claim is not readily apparent from the pleading. However, given that there is at least some reference to facts that might support such a claim, the Court will permit Plaintiffs to file a Second Amended Complaint that asserts this claim.

In allowing Plaintiff to file a Second Amended Complaint, the Court is not suggesting that a claim alleging that Defendants failed to disclose facts they learned or should have learned in 2004 is legally viable or is not preempted. The Court believes that, given the early stage of this

15

litigation, Plaintiffs should have a chance to state this claim – which at least has been hinted at in Plaintiffs' prior pleadings – more clearly.  Therefore, Defendants are free to file a Motion to Dismiss the Second Amended Complaint once it is filed if they deem it appropriate to do so.

### III.  CONCLUSION

The Motion to Dismiss, (Doc. 28), is **GRANTED** but the case will remain open so that Plaintiffs may file a Second Amended Complaint that (1) asserts a claim predicated on Defendants' failure to disclose facts in 2004 and (2) omits the claims that have been dismissed by this Order (along with any factual allegations that are germane only to the dismissed claims).  Plaintiffs shall have fourteen days to file their Second Amended Complaint; should they elect not to do so, the case will be closed and judgment will be entered.[10]

The Motion to Strike, (Doc. 27), is **DENIED AS MOOT.**

**IT IS SO ORDERED.**

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
**DATE**: May 18, 2022                     UNITED STATES DISTRICT COURT

---

[10] There is some confusion (or, perhaps, duplication) of the parties on the Docket Sheet, possibly because Defendants' names are spelled differently on the Complaint, (Doc. 1), the Amended Complaint, (Doc. 20), and the Civil Cover Sheet, (Doc. 1-1) ("Northr*op*" as opposed to "Northr*u*p").  The Court believes "Northrop" is the correct spelling.  To enable the Court to correct the Docket Sheet, if Plaintiffs file a Second Amended Complaint, they are requested to review the parties they name; all other names on the Docket Sheet will then be terminated.