# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### SOUTHERN DIVISION

|  |  |
|---|---|
| DON YORK, BEVERLY YORK, JACOB STRADLING, ALISHA YORK STRADLING, JACK HARVEY, and JUDY HARVEY, individually and on behalf all others similarly situated, | Court File No.: 6:21-cv-03251-BP |
| | Judge: Chief Judge Beth Phillips |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| vs. | |
| NORTHROP GRUMMAN GUIDANCE AND ELECTRONICS COMPANY INC., NORTHROP GRUMMAN CORPORATION, and NORTHROP GRUMMAN MISSION SYSTEMS, | |
| Defendants. | |

## SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs Don York, Beverly York, Alisha York Stradling, Jacob Stradling, Jack Harvey, and Judy Harvey, individually and on behalf of those similarly situated ("Plaintiffs"), for their Class Action Complaint against Northrop Grumman Guidance and Electronics Company Inc., Northrop Grumman Corporation, and Northrop Grumman Mission Systems (collectively "Northrop Grumman" or "Defendants") state as follows:

### Introduction

1. Defendants own, operate, and/or are legally responsible for a former Litton Systems Inc. site at 4811 W. Kearney St. in Springfield, Missouri.

1

2.   Plaintiffs, tenants, and owner-occupants of real property in Springfield, Missouri, and those similarly situated, bring this action for damages and injunction against Defendants for Defendants' unreasonable negligence based on TCE contamination from Litton Systems Inc. property ("the Contamination Site" or "the Site")—a site that despite almost 40 years of reclamation, still is a source of dangerous TCE.

3.   The Contamination Site has caused an increase in concentration of TCE[1] in an expanding amount of land and ground water surrounding the Site and throughout portions of Springfield.

4.   Unbeknownst to the Plaintiffs, through no fault of their own, and due to a failure on the Defendants' part to warn of facts within their possession, for years, Plaintiffs and their property have been exposed to TCE from the Contamination Site. Due to only recently being informed of the risk of TCE and the actual presence of TCE on their property, Plaintiffs are and have been unable to fully enjoy the use of their properties, have suffered annoyance and discomfort, and have been exposed to TCE for over a decade. For example, Plaintiffs' well-water is contaminated with unsafe levels of TCE, and has been for years, thereby preventing Plaintiffs from using well water as they would like (e.g., without the need for treatment systems which changed the taste of the water). Further, Plaintiffs have suffered a diminution in property value solely due to TCE contamination.

5.   Also, upon information and belief, through regular use of their well water, Plaintiffs have been exposed to unsafe levels of TCE from the Contamination Site for over a decade solely

---

[1] While Plaintiffs refer to the contaminants as TCE throughout, there were other contaminants released by the Litton Site, including but not limited to copper. Although the focus of this complaint is on TCE, all contaminants from the TCE Contamination Site are at issue in this action.

due to Defendants' failure to warn of TCE in private wells. Such long-term exposure to TCE has caused health concerns and anxiety. Had Plaintiffs been made aware of such TCE contamination when Defendants' duty to warn arose (e.g., in 2004), they would not have used their well water, purchased their properties, and/or spent money improving their properties.

6.  As shown below, Defendants knew since at least 2004 of TCE contamination of the Springfield Aquifer, the Ozark Aquifer, and at least one "private well," and yet withheld this information from Plaintiffs, the Classes, and the public.

7.  Because of this lack of disclosure, the concentration of TCE that Plaintiffs were exposed to by using their properties and well water exceeded regulatory limits.

8.  Further, any concentration of TCE within Plaintiffs' and the Classes' properties will be required to be disclosed to potential buyers should Plaintiffs and the Classes choose to sell their properties. Because TCE concentrations are present, the value of Plaintiffs' and the Classes' properties have diminished and, in some cases, their properties are worthless.

9.  Further, certain Plaintiffs have experienced other economic losses as described below.

## The Parties and Venue

10. Plaintiffs Don and Beverly York are owners of improved real property located on 2225 North Plainview Avenue in Springfield, Missouri. Plaintiffs Don and Beverly York have owned the property since 2006. While owning this property, they drank well water, bathed in well water, washed their clothing in well water, and cooked with well water—water now determined to be contaminated with unsafe levels of TCE. Plaintiffs Don and Beverly York were not aware that TCE from the Site had contaminated private wells in Springfield until

2018. Plaintiffs Don and Beverly York were also unaware that their well water was contaminated with TCE until testing on their well was performed in Dec. 2018.

11. Plaintiffs Alisha York Stradling and Jacob Stradling were tenants at Don and Beverly York's improved real property, running a business from the location starting in 2018. Plaintiffs Alisha York Stradling and Jacob Stradling were tenants and worked from this address from 2018 until 2021. Jacob Stradling worked approximately 70 hours a week from this property during this time, many nights sleeping at the property. Alisha York Stradling would sometimes work 40 hours a week there. Plaintiffs Alisha York Stradling and Jacob Stradling were not aware that TCE from the Site had contaminated private wells in Springfield until 2018. Plaintiffs Alisha York Stradling and Jacob Stradling were also unaware that their well water was contaminated with TCE until testing on their well was performed in Dec. 2018.

12. While there, Plaintiffs Alisha York Stradling and Jacob Stradling spent $125,000 improving the property. They also drank well water, bathed in well water, washed their clothing in well water, and cooked with well water—water now determined to be contaminated with unsafe levels of TCE.

13. Plaintiffs Jack and Judy Harvey are homeowners of improved real property located at 2224 North Plainview Drive. Plaintiffs own a home on this property and have resided at this address for at least over 20 years. While they resided at this property, they drank well water, bathed in well water, washed their clothing in well water, and cooked with well water—water now determined to be contaminated with unsafe levels of TCE. Plaintiffs Jack and Judy Harvey were not aware that TCE from the Site had contaminated private wells in Springfield

until 2018. Plaintiffs Jack and Judy Harvey were also unaware that their well water was contaminated with TCE until testing on their well was performed in Dec. 2018.

14. Upon information and belief, Defendant Northrop Grumman Corporation is a Delaware Corporation, with its principal place of business at 55 Thiokol Rd, Elkton, MD 21921. Defendant Northrop Grumman Corporation conducts business in the State of Missouri.

15. Upon information and belief, Defendant Northrop Grumman Corporation acquired the Litton Systems property in Springfield when it bought the parent company, Litton Industries, for $5.1 billion in 2001.

16. Upon information and belief, Defendant Northrop Grumman Guidance and Electronics Company Inc. is a subsidiary of Northrop Grumman Corporation. Upon information and belief, Defendant Northrop Grumman Guidance and Electronics Company Inc. has a principal place of business at Falls Church, Virginia. Upon information and belief, Defendant Northrop Grumman Guidance and Electronics Company Inc. conducts business in the State of Missouri.

17. Upon information and belief, Defendant Northrop Grumman Mission Systems is a subsidiary of Northrop Grumman Corporation. Upon information and belief, Defendant Northrop Grumman Mission Systems is a Delaware Corporation, with its principal place of business in Linthicum, MD 21921. Upon information and belief, Defendant Northrop Grumman Mission Systems conducts business in the State of Missouri.

18. Defendants have owned, operated, and/or are legally responsible for the Contamination Site for all times relevant to this Petition, but at least as early as 2001.

19. To the extent Defendants were not owners or operators of the Contamination Site before the events relevant to this case, they (or their employees or agents) have been working

directly with the Missouri Department of Natural Resources ("DNR") and the Environmental Protection Agency ("EPA") regarding the TCE contamination since 2001.

20. To the extent Defendants were not operators of the Contamination Site before the events relevant to this case, they (or their employees or agents) otherwise worked with the Contamination Site and/or have been involved with the decision-making regarding operations and/or cleanup of the Contamination Site since they acquired legal responsibility for the site in 2001.

21. Alternatively, Defendants Northrop Grumman Corporation and/or Northrop Grumman Mission Systems are the alter ego of Northrop Grumman Guidance and Electronics Company Inc. Consequently, one, two, or all Defendants are vicariously liable for the actions of the Contamination Site.

22. Jurisdiction is proper in this Court under 28 U.S. Code § 1332(d)(2).

23. Venue is proper pursuant to §508.010 RSMo.

## **Factual Background**

### **The Danger of TCE**

24. The federal government has linked TCE to health problems including kidney cancer, liver cancer, and non-Hodgkin's lymphoma. It can also be a cause of non-cancerous problems for the immune and nervous systems, the kidneys and liver, the male reproductive system, and fetal tissue. TCE is known to cause spontaneous abortions in pregnant women as well.[2]

25. As a DNR spokesperson stated at a 2019 public forum discussing TCE issues in Springfield, MO, government regulatory limits on chemicals like TCE are "based in part on

---

[2] See, e.g., Ex. O, *Spontaneous Abortions and Congenital Malformations among Women Exposed to Tetrachloroethylene in Dry Cleaning*, P Kyyrönen, et al., J Epidemiol Community Health. 1989 Dec; 43(4): 346–351.

science and in part on lobbying and concerns by people."[3] The EPA limit for TCE in liquid water — 5 parts per billion — should be viewed in that light, he said. "It doesn't mean it's safe at 4.9 and harmful at 5.1," he said. "It's like a speed limit. Anytime you move, you have some risk of an accident."

26. An EPA, internal memoranda from 2021 confirmed "Over the past few years…political interference sometimes compromised the integrity of our science." One such example was reporting on the dangers of TCE:

> White House staff directed OCSPP career staff to alter the draft TCE risk evaluation to change the point of departure used for making determinations of risk to a less sensitive endpoint. While the risk evaluation included a description of the more sensitive endpoint (fetal heart malformations), it was no longer used to determine whether there is unreasonable risk from TCE. Unreasonable risks were nevertheless identified for most uses of TCE, but the magnitude of the risk from exposures to TCE would have been greater had EPA relied upon the fetal cardiac defect endpoint that had been used in previous EPA peer-reviewed assessments.[4]

27. Thus, even levels that the EPA contend are "safe" can harm especially through repeated exposures.

28. TCE can move thousands of feet per day through groundwater systems, especially in cave-rich/karst topography like the land near the Contamination Site. This means, through no fault of other property owners, their properties can become contaminated with TCE.

---

[3] "DNR official at public forum: 'I apologize' for how Missouri handled TCE pollution," Springfield News-Leader (2019) from https://www.news-leader.com/story/news/local/ozarks/2019/03/15/springfield-greene-county-pollution-dnr-tce-litton-systems/3133068002/ (last viewed June 4, 2021).
[4] EPA Memorandum on Scientific Integrity (2021) from https://www2.dtn.com/ag/assets/EPA-Memorandum-Scientific-Integrity.pdf (last viewed June 4, 2021).

7

**TCE Contamination Within Springfield, MO**

29. Litton Systems Inc. began manufacturing printed circuit boards in the 1960s in a site located at 4811 W. Kearney St. in Springfield on approximately 70 acres of land just east of the Springfield-Branson National Airport.

30. This site is less than a quarter mile from Plaintiffs' properties.

31. At this site, Litton utilized TCE in its manufacturing process to clean circuit boards.

32. Through its day-to-day operations, the Litton facility generated waste containing metals, predominantly copper, and volatile organic compounds such as TCE.

33. Until the early '80s, the Litton facility managed wastes in a series of on-site waste management units consisting of shallow lagoons, waste piles, and pits. This waste management procedure did not fully contain the materials.

34. In a 1982 lawsuit, Missouri state attorneys alleged that Litton failed to keep water in the lagoon at required levels, that Litton increased the lagoon's capacity by 25 percent without getting the necessary permit, and that the company did not install a groundwater monitoring program to warn of possible contamination.

35. Contamination in Springfield is especially troubling as its geography consists of an extensive network of voids, caverns, and sinkholes in the shallow bedrock, and springs that surface at various points. This "karst" geology provides selective pathways for contamination to potentially travel farther than in soil or saturated groundwater zones. In karst geology, groundwater contaminant plumes are difficult to delineate because they often do not follow a predictable pattern.

36. On Aug. 18, 1983, the Springfield News-Leader in discussing the Missouri state attorney lawsuit reported that "Although state officials could not tie those toxic wastes to any

contamination of nearby wells…they argued it would only be a matter of time if seepage continued."[5] As will be shown, since 1983, contamination of wells has occurred due to Defendants' failure to contain TCE seepage.

37. According to DNR, in 1983 Litton agreed to pay a $50,000 fine for violations of Missouri's hazardous waste management law because of the groundwater pollution. Litton also drained the lagoon and spent $250,000 to clean up the site. Upon information and belief, this agreement settled the lawsuit.

38. Upon information and belief, as part of the settlement, a network of monitoring wells and extractions wells were put in place under DNR oversight.

**Defendants are the Responsible Parties for the Contamination Site.**

39. In 2001, Northrop Grumman acquired the Litton Systems property in Springfield when it bought the parent company, Litton Industries, for $5.1 billion. At the time of purchase, Defendants were aware of the TCE contamination at the Site.

40. With this purchase, Northrop Grumman became the legally responsible party for the Contamination Site.

41. On or about 2010, a notice of consent decree was published in the Springfield News Leader stating that Northrop Grumman Guidance and Electronics Company, Inc. is the "responsible party" for the site.

---

[5] "DNR official at public forum: 'I apologize' for how Missouri handled TCE pollution," Springfield News-Leader (2019) from https://www.news-leader.com/story/news/local/ozarks/2019/03/15/springfield-greene-county-pollution-dnr-tce-litton-systems/3133068002/ (last viewed June 4, 2021).

**Notice of Lodging of Consent Decree For Environmental Cleanup at the Former Litton Systems, Inc. site, Springfield, Missouri**

A Consent Decree and Settlement between Northrop Grumman Guidance and Electronics Company, Inc., responsible party for the former Litton Systems, Inc. site, and the State of Missouri has been lodged at the United States District Court for the Western District of Missouri. The former Litton site, located at 4811 West Kearney Street, Springfield, Missouri manufactured printed circuit boards. Volatile organic compounds (primarily trichloroethylene) and copper have contaminated on-site soil and groundwater. The Consent Decree replaces an agreement signed in 1993 and provides more details on the plan for cleaning up the site.

The Proposed Consent Decree is available on the department's website at dnr.mo.gov/env/hwp/sfund/public.htm and at Springfield-Greene County Library, located at 4653 South Campbell in Springfield.

The Missouri Department of Natural Resources will be accepting comments relating to the Proposed Consent Decree through Jan. 21, 2011. Comments should be addressed to:

Mark Conner
Missouri Department of Natural Resources
Hazardous Waste Program
P.O. Box 176, Jefferson City, MO 65102-0176
Fax 573-751-7869
E-mail: mark.conner@dnr.mo.gov

42. According to this publication, "Volatile organic compounds (primarily trichloroethylene) and copper have contaminated *on-site* soil and groundwater." (Emphasis added). There is no mention that TCE or copper from the Site had contaminated soil and groundwater beyond the Site, or that private wells in Springfield tested positive for TCE starting in at least 2004.

43. As the legally responsible parties for the site, Defendants have been and are working with DNR to, as Section 1.1 of the Scope of Work to the 2010 Consent Decree states, implement "on-site, and if necessary, off-site remedial action of impacted soils" associated with the Site.

44. Of note, Paragraph 17 of the 2010 Consent decree "does not include conducting a Feasibility Study for groundwater or implementing a remedy for impacted groundwater."

**Despite Decades of Attempted Remediation, TCE has Spread from the Contamination Site.**

45. After 2001, public attention about the Contamination Site was limited, in most part due to a lack of disclosures from the Defendants and DNR.

10

46. Public attention only focused again on TCE from the Contamination Site due to DNR testing at a tourist attraction called Fantastic Caverns. DNR testing at Fantastic Caverns discovered TCE vapor had reached lower parts of the cave system. Upon information and belief, this testing was performed in 2016-2017.

47. Upon information and belief, the public only became aware of the discovery of TCE in private wells from the Contamination Site at Fantastic Caverns because Fantastic Caverns itself went public with this information and because local television ran stories about vent holes being drilled at Fantastic Caverns.

48. After Fantastic Caverns went public about the discovery of TCE from the Site in its cave system, DNR tested wells around the Contamination Site. Upon information and belief, those tests began in 2018.

49. Although during the 1982 lawsuit, DNR could not identify any TCE contamination in nearby wells, that changed: in 2018, TCE was detected in numerous Springfield residents and tenants' wells.

50. In view of this, DNR offered free well testing for property owners within the TCE contamination focus zone for areas near the former Litton site.

51. To date, DNR has received several hundred requests to test private water wells for the presence of TCE.

52. Where tests have found TCE in private wells, DNR and Defendants have scheduled either quarterly or monthly follow ups to continue testing the wells. This is because test results for TCE on wells vary over time, meaning a well that might test below the maximum

contaminant level (MCL)[6] for TCE for one test, might test above the MCL for the next (or a following) test.

53. Tom Aley, a hydrogeologist with Ozarks Underground Laboratory who consults on groundwater issues nationwide, worked with Fantastic Caverns to address its TCE issues. In a presentation he gave at a 2019 public forum at the Ozark Empire Fairgrounds, Aley told residents that TCE can move thousands of feet per day through groundwater systems, especially in cave-rich karst topography like the land near the Litton site.

54. At the public forum, Aley also displayed the below map showing the results of DNR's TCE testing.



---

[6] Maximum contaminant levels (MCLs) are standards set by the EPA for drinking water quality. An MCL is the legal threshold limit on the amount of a substance that is allowed in public water systems under the Safe Drinking Water Act. The limit is usually expressed as a concentration in milligrams or micrograms per liter of water. For TCE, it is 5 µg/L or 5 ppb.

Case 6:21-cv-03251-BP   Document 44   Filed 06/01/22   Page 12 of 58

55. The yellow dots denote wells contaminated with TCE; red dots denote wells with levels of TCE contamination above a safe level. The red line denotes the focus area where DNR offered free water well testing for TCE. Plaintiffs' properties are denoted on the map as the two red dots just below the Litton site.



56. As can be seen from the map, in a 21-square mile area around the Litton site, DNR found detectable quantities of TCE in 24 percent of water wells it tested.

57. Positive tests confirm that TCE is present at a minimum under the land of Springfield property owners that they did not know about, or put there, and has the potential for harm.

58. TCE vapor will affect homes and businesses in the area, though the extent will not be known unless DNR and Northrop Grumman conduct more targeted testing for vapor, along with groundwater sampling.

59. According to DNR, TCE contamination has been found in the two layers of water — the shallow Springfield Plateau Aquifer, about 115 feet deep, and the much deeper Ozark Aquifer, which is some 600 feet below the surface. Local wells use one or both aquifers for their water supply.

13

60. This TCE contamination came as a surprise to Springfield property owners. At a 2019

public forum at the Ozark Empire Fairgrounds a Missouri DNR official apologized for the

way the state—and necessarily for the Defendants—handled the TCE contamination.

> "For those people for whom this came as a surprise, especially for those who had
> TCE in their (water) wells and didn't know it, I apologize," Galbraith said. "We
> didn't tell people about it in a timely manner. We're here in part to make
> amends."[7]

61. A 2020 Northrop Grumman report to the Missouri DNR report confirmed TCE

contamination is still an issue for Springfield.



**Groundwater and Springs**

What We Know

- TCE is present on the Site in the Springfield and Ozark aquifers
- TCE is present on the airport in the Springfield and Ozark aquifers
- TCE is present in domestic wells to the North, East, and South of the site
- TCE is present in springs to the North and East of the site

Ex. A, Technical Update and Conceptual Path Forward, Northrop Grumman Missions

Systems Presentation (Jan. 2020) at 75.

62. Worse, the report does not provide a favorable prognosis for remedying the

contamination.

---

[7] "DNR official at public forum: 'I apologize' for how Missouri handled TCE pollution,"
Springfield News-Leader (2019) from https://www.news-
leader.com/story/news/local/ozarks/2019/03/15/springfield-greene-county-pollution-dnr-tce-
litton-systems/3133068002/ (last viewed June 4, 2021).



**What We Know**

- It is technically infeasible to hydraulically capture contaminant mass in the karst system under dynamic flow conditions

*Id.* at 82.

63. DNR documents show the extent of the contamination still being dealt. After decades, a large TCE plume remains below the Litton site "in soil, shallow bedrock, and deep bedrock." Ex. B.



These same documents confirm that contaminated groundwater from the Site "enters karst conduits and travels long distances rapidly," taking only three days to reach Fantastic

Caverns three miles away. *Id.* Further, the contaminated "shallow groundwater off gasses as it travels to springs." *Id*. In other words, the Contaminated Site is still a dangerous source of TCE.

64. Also concerning, in 2020 the Defendants admitted they did not understand how TCE spread to many sites in Springfield, including, the Plaintiffs' sites by name.

1. How is TCE getting from the Site to Domestic Wells:
   a) East of the Site near Ritter Springs?
   b) North of the Site near Fantastic Caverns?
   c) South of the Site (York and Harvey Wells)?

Ex. A at 86.

65. Further, this same 2020 report specifically addressed Plaintiffs' properties by name ("York and Harvey") in a slide entitled "Overview of *Key Site* Features." (Emphasis added).



Overview of Key Site Features

*Id.* at 41. This is an admission that the York and Harvey properties for DNR *and the Defendants* are "Key Sites" when it comes to TCE contamination.

66. Defendants have had at least two decades to remediate the Contamination Site and to prevent the spread of TCE. As can be seen due to the numerous positive well tests for TCE, Defendants have failed and refused to fully remediate the TCE contamination despite the potential dangers and daily annoyance and distress to Plaintiffs and those similarly situated. Defendants also failed to timely warn Plaintiffs, the Classes, and the public of the spread of TCE from the Contamination Site through the Ozark and Springfield Aquifers and, as discussed in greater detail below, into at least one known "private well." Because of this, and through no fault of their own, innocent third parties' properties are ruined, and their health jeopardized.

67. Although in 1983 there was no "contamination of nearby wells," through mismanagement of the site, not just nearby wells, but wells throughout Springfield have tested positive for TCE.

68. As the responsible parties, Defendants owed a duty to Springfield residents to prevent the spread of TCE and to bring awareness of the spread to the community. They have failed.

**TCE Contamination to Plaintiffs' Properties**

69. Plaintiffs' wells were not tested by DNR until late 2018. When asked why it took so long to test Plaintiffs' wells, DNR answered: 1) both the Yorks and Harveys had city addresses, and therefore DNR assumed both were on city water (in other words, that both did not have wells), and 2) DNR assumed that water in the aquifers below Plaintiffs' property flowed to the North and East and because the Plaintiffs' property was south of the Contaminated Site

(despite being less than a quarter mile from the Contaminated Site), it was safe. Both assumptions were wrong.

70. When Plaintiffs' wells were tested, they had some of the highest levels of TCE of all tested wells. For example, the results of the York residence were as high as 87 µg/L—over 17 times higher than the 5 µg/L MCL.

| 455 | Mthly | 2225 North Plainview Road | MoDNR | 12/4/2018 | 524.2 | 64.2 |
|-----|-------|---------------------------|-------|-----------|-------|------|
| | System Sampling | | NGC | 12/21/2018 | 8260 | 87 |
| | System Sampling | | NGC | 12/21/2018 | 8260 | ND |
| | System Sampling | | NGC | 1/14/2019 | 624 low | 14 |
| | System Sampling | | NGC | 1/14/2019 | 624 low | ND |
| | System Sampling | | NGC | 2/18/2019 | 8260 | 8.3 |
| | System Sampling | | NGC | 2/18/2019 | 8260 | ND |
| | System Sampling | | NGC | 3/22/2019 | 8260 | 4.3 |
| | System Sampling | | NGC | 3/22/2019 | 8260 | ND |
| | System Sampling | | NGC | 4/29/2019 | 8260 | 3.3 |
| | System Sampling | | NGC | 4/29/2019 | 8260 | ND |
| | System Sampling | | NGC | 5/29/2019 | 8260 | 3.9 |
| | System Sampling | | NGC | 5/29/2019 | 8260 | ND |
| | System Sampling | | NGC | 6/28/2019 | 8260 | 12.2 |
| | System Sampling | | NGC | 6/28/2019 | 8260 | ND |
| | System Sampling | | NGC | 8/13/2019 | 8260 | 10.9 |
| | System Sampling | | NGC | 8/13/2019 | 8260 | ND |
| | System Sampling | | MoDNR | 8/13/2019 | 8260 | 18.4 |
| | System Sampling | | MoDNR | 8/13/2019 | 8260 | ND |
| | System Sampling | | NGC | 11/13/2019 | 8260 | 6.8 |
| | System Sampling | | NGC | 11/13/2019 | 8260 | ND |
| | System Sampling | | NGC | 2/17/2020 | 8260 | 3.4 |
| | System Sampling | | NGC | 2/17/2020 | 8260 | ND |
| | System Sampling | | NGC | 2/17/2020 | 8260 | 4.3 |
| | System Sampling | | NGC | 2/17/2020 | 8260 | ND |

| | | | | |
|---|---|---|---|---|
| System Sampling | NGC | 5/19/2020 | 8260 | 0.42 J |
| System Sampling | NGC | 5/19/2020 | 8260 | ND |
| System Sampling | NGC | 6/19/2020 | 8260 | 1.4 |
| System Sampling | NGC | 6/19/2020 | 8260 | ND |
| System Sampling | NGC | 6/19/2020 | 8260 | 1.3 |
| System Sampling | NGC | 6/19/2020 | 8260 | ND |
| System Sampling | NGC | 8/19/2020 | 8260 | NA |
| System Sampling | NGC | 8/19/2020 | 8260 | ND |
| System Sampling | NGC | 8/19/2020 | 8260 | 10.2 |
| System Sampling | NGC | 8/19/2020 | 8260 | ND |

Similarly, the Harvey residence has been tested as high as 79.6 µg/L:

| | | | | | |
|---|---|---|---|---|---|
| MoDNR | 12/4/2018 | 524.2 | 47.7 | NA | 2.45 |
| NGC | 12/21/2018 | 8260 | 37 | 2.1 | 2.1 |
| NGC | 12/21/2018 | 8260 | ND | ND | ND |
| NGC | 1/14/2019 | 624 low | 22 | NA | 1.1 |
| NGC | 1/14/2019 | 624 low | ND | NA | ND |
| NGC | 2/18/2019 | 8260 | 64.7 | 3.8 | 3.8 |
| NGC | 2/18/2019 | 8260 | ND | ND | ND |
| NGC | 3/22/2019 | 8260 | 79.6 | 5.4 | 5.4 |
| NGC | 3/22/2019 | 8260 | ND | ND | ND |
| NGC | 4/29/2019 | 8260 | 19.3 | 1.1 | 1.1 |
| NGC | 4/29/2019 | 8260 | ND | ND | ND |
| NGC | 5/29/2019 | 8260 | 28.9 | 1.6 | 1.6 |
| NGC | 5/29/2019 | 8260 | ND | ND | ND |
| NGC | 6/28/2019 | 8260 | 74.4 | 4.6 | 4.6 |
| NGC | 6/28/2019 | 8260 | ND | ND | ND |
| NGC | 8/14/2019 | 8260 | 49.1 | 2.9 | 2.9 |
| NGC | 8/14/2019 | 8260 | ND | ND | ND |
| MoDNR | 8/14/2019 | 8260 | 45.0 | NA | 2.58 |
| MoDNR | 8/14/2019 | 8260 | ND | NA | ND |
| NGC | 11/13/2019 | 8260 | 6.0 | ND | ND |
| NGC | 11/13/2019 | 8260 | ND | ND | ND |
| NGC | 2/17/2020 | 8260 | 3.6 | ND | ND |
| NGC | 2/17/2020 | 8260 | ND | ND | ND |
| NGC | 2/17/2020 | 8260 | 3.0 | ND | ND |
| NGC | 2/17/2020 | 8260 | ND | ND | ND |
| NGC | 5/19/2020 | 8260 | 2.7 | ND | ND |
| NGC | 5/19/2020 | 8260 | ND | ND | ND |
| NGC | 6/19/2020 | 8260 | 13.6 | 0.72J | 0.72J |
| NGC | 6/19/2020 | 8260 | ND | ND | ND |
| NGC | 6/19/2020 | 8260 | 17 | NA | ND |
| NGC | 6/19/2020 | 8260 | ND | NA | ND |
| NGC | 8/19/2020 | 8260 | NA | NA | NA |
| NGC | 8/19/2020 | 8260 | ND | ND | ND |
| NGC | 8/19/2020 | 8260 | 65.8 | 4.0 | 4.0 |
| NGC | 8/19/2020 | 8260 | ND | ND | ND |

71. DNR and Defendants' behind-the-scenes discussions confirm Defendants violated duties owed to others, including specifically to the Plaintiffs.

72. During one of the first meetings Plaintiffs had with DNR (after their original TCE test in 2018) at DNR's main office in Springfield, Don York asked DNR employee Valerie Wilder

why DNR and Defendants did not let people know earlier about the TCE contamination. Valerie Wilder responded that they did not want to make it public because they did not want to make a panic. Upon information and belief, two of Defendants' employees also attended this meeting.

73. Through a 2021 sunshine request for DNR materials related to the Contamination Site, numerous documents were produced showing communications between DNR and Defendants specifically about the Plaintiffs.

74. For example, during an August 6, 2020, meeting, DNR and Defendants discussed the York and Harvey properties. Ex. C, 8/6/2020 Litton Systems Monthly Coordination Call Agenda/Notes. The Yorks and Harveys were not present for this meeting. *Id*.

75. At the August 6 meeting, DNR and Defendants expressed a desire to perform geophysical tests on the York property. *Id.* Such testing was necessary for future remedial measures because, as discussed above, the DNR and Defendants assumed TCE contamination would flow north and east. The fact that Plaintiffs' properties were south of the Contamination Site and had some of the highest levels of TCE of all the tested wells showed the assumptions that DNR and Defendants had been operating under for decades were incorrect.

76. The tests discussed at this meeting would be intrusive. As a 2020 email produced by the DNR explained "…Northrop Grumman has proposed collecting down hole geophysical data at select locations. As we have discussed, this process will be fairly intrusive for residents as the pump must be removed from the well casing and an alternative supply of water must be provided to the resident." Ex. D, 5/20/2020 DNR email.

77. Rather than purchase the contaminated properties for such admittedly "intrusive" and necessary remedial analyses (again, the DNR and Defendants had for decades assumed that

TCE would flow away from Plaintiffs' properties), Defendants instead tied an offer of running public water lines to Plaintiffs' properties with allowing Defendants the ability to run such tests. Ex. C, 8/6/2020 Monthly Call Notes. However, along with the offered water lines, Plaintiffs would be required to pay monthly bills for water they already were supposed to get for free from their wells. *Id.*

78. Worse, the Defendants and DNR at this meeting stated even the proposal of running water lines might not be feasible for multiple reasons, most notably due to the extent of contamination north of Plaintiffs' properties.

> JK – have been in contact w/ Mr. York re concerns. In Nov he said if he had public water that would be OK; he now wants NG to buy his property. Currently working with Mr. Harvey to extend PW to his property. Hope this will give Mr. York incentive to accept. If he does this would allow geophysics on York well.
> …
> JK - let's see what Mr. Harvey does then evaluate. NG not interested in York property at price quoted. NG policy is that we don't purchase property unless there is use for facility operations or remedial actions.
> VW - is there a plan that CDMS has put together that we can possibly provide for mgt.?
> JK - Not at this time. They are looking into cost. If cost is reasonable concept is that NG will cover water line installations & owners would pay water bills. Not sure this will be feasible due to north extent of contamination-cost, & owner interest. City has been great to work with

*Id.*

79. Defendants' proclamation of "NG policy [being] that we don't purchase property unless there is use for facility operations or remedial actions," shows it had a duty to purchase the Plaintiffs' properties. *Id.* The decades' long assumption that TCE from the Contamination Site would only flow north and east was shown to be incorrect. Not only was this assumption incorrect, but Plaintiffs also had some of the highest levels of TCE detected. Defendants recognized then they had a duty to conduct "intrusive" geophysical tests on Plaintiffs' property to understand why their previous assumptions were incorrect. Such steps were

22

necessary for "remedial actions," and, therefore, under Defendants' own-admitted "policy," would require purchase of Plaintiffs' properties. Defendants, however, refused to abide by their own "policy," showing they violated their duty owed to Plaintiffs and to other residents of Springfield to fully remediate this contamination.

**Plaintiffs' Properties**

80. Plaintiffs' properties are less than a quarter mile from the Contamination Site.

81. Plaintiffs Don and Beverly York purchased their property in 2006. At the time they purchased their property, they were unaware that the former Litton site was contaminated with TCE. Plaintiffs did not learn about the TCE contamination until 2018.

82. During soil testing in 2018, DNR found TCE in the soil at 6' depth in the Plaintiff's property.

83. TCE was also found in Plaintiffs' well water.

84. Prior to discovering TCE on their property, Plaintiffs Don and Beverly York had over $600,000.00 in purchase and improvements into their property. Had they known of the TCE contamination at the Litton site or on their property, they would not have purchased their property and would not have made any improvements.

85. Plaintiff's daughter Alisha York Stradling and her husband Jacob Stradling invested another $125,000.00 in improvements into the York property before finding out about the TCE contamination. Had they known of the TCE contamination at the Litton site or on their property, they would not have made any improvements.

86. Plaintiffs Jack and Judy Harvey purchased their property in Springfield over 20 years ago. At the time they purchased their property, they were unaware that the former Litton site

was contaminated with TCE. The Harvey Plaintiffs did not learn about the TCE contamination of their well water until 2018.

87. Prior to discovering TCE on their property, the Harvey Plaintiffs invested in purchase and improvements into their property. Had they known of the TCE contamination at the Litton site or on their property, they would not have purchased their property and would not have made any improvements.

88. Further, due to Missouri real-estate disclosure laws, Plaintiffs will be unable to sell their property due to need to disclose the contamination.

89. Further, at least one real estate agent has advised Plaintiffs that banks would not offer financing to anyone interested in purchasing their property and that Plaintiffs would likely not receive offers due to the contamination.

90. Plaintiffs Don and Beverly York had intentions of selling their property to Alisha York Stradling and Jacob Stradling prior to finding out about the contamination. In view of this, Alisha York Stradling and Jacob Stradling spent a great deal of money on improvements. Due to the contamination, that will not happen and Plaintiffs' investments in the property are now worthless.

91. Plaintiffs are trapped with huge investments that have been destroyed by the TCE contamination and Defendants' handling of the cleanup. Simply having TCE on Plaintiffs' property impacts their ability to sell their property, as well as reduces the value of their property.

92. Further, there are health concerns due to the property. Plaintiffs have for years used well-water now found to be contaminated with unsafe levels of TCE. Plaintiffs are afraid that due to the mismanagement of the Contamination Site, they may be subject to future illnesses.

93. Further, Terry York (Don York's brother) resided on the York property from 2006-2012. While residing there, he drank well water, bathed in well water, washed his clothing in well water, and cooked with well water now found to be contaminated with TCE. After leaving the property, Terry York developed kidney issues. He has since passed away. Upon information and belief, TCE from the contamination site was the source of Terry York's kidney issues.

94. Plaintiffs, and those similarly situated, with positive test results for TCE on their property are unable to fully enjoy the use of their property.

95. Due to the inability to directly drink well water, Plaintiffs experience annoyance and discomfort, especially for those that prefer their own-managed well-water to other alternatives. To be clear, Plaintiffs prefer well water.

96. In view of the TCE contamination found in Plaintiffs' wells, Defendants provided filtration systems to both the Yorks and Harveys.

97. These filtration systems changed the taste of the water which Plaintiffs now find less enjoyable than their well water.

98. Defendants provide periodic maintenance to these filtration systems including replacing the carbon in the treatment system with fresh granulated activated carbon. Upon information and belief, the filtration systems require such maintenance to ensure functionality, which necessarily requires Defendants (or their agents) to enter Plaintiffs' property (periodic intrusions which Plaintiffs find annoying but necessary to have filtered water). When Defendants do so, their analyses confirm that the untreated well is still contaminated with TCE.

99. Should these filtration systems stop working in between the maintenance periods, Plaintiffs would again be exposed to dangerous levels of TCE.

100.    Plaintiffs and the Class are also fearful that their years of exposure to TCE have or will cause health issues as well.

101.    Identifying such health issues will require medical evaluations.

102.    Plaintiffs' exposure to TCE originated from a single source: the Contamination Site.

103.    Plaintiffs and the Classes should therefore be allowed to recover the quantifiable costs of periodic medical examinations reasonably necessary for the early detection and treatment of latent injuries caused by exposure to toxic substances from the TCE Contamination Site.


**Defendants Failed to Warn that TCE Had Contaminated the Ozark and Springfield Aquifer and at Least One Known Private Well for Over a Decade.**

104.    When Plaintiffs purchased the properties at issue in this action, they were unaware that the former Litton Site was contaminated with TCE and that TCE had spread from the site.

105.    At the time Plaintiffs purchased their property and since they have owned it, there has not been signage at the former Litton Site warning of TCE contamination. There currently is no such signage at the Contamination Site.

106.    Further, Defendants did not notify Plaintiffs or the Classes that at least one private well in the area was known by Defendants to be contaminated with TCE in 2004, prior to the time Plaintiffs and the Classes purchased their properties, made improvements to their properties, and/or used their well water.

26

107.     Additionally, on or about 2010, a notice of consent decree was published in the Springfield News Leader. This publication misled the public by stating that "Volatile organic compounds (primarily trichloroethylene) and copper have contaminated *on-site* soil and groundwater." (Emphasis added). There was no mention in this 2010 publication that TCE or copper from the Site had contaminated soil and groundwater *beyond* the Site, or that private wells in Springfield were not only at risk due to TCE from the Site. The 2010 publication also did not disclose that Defendants knew at least as early as 2004 that TCE from the Site had been found in at least one offsite "private well." This information was negligently, if not intentionally, withheld from the public, prior to the entry of the 2010 Consent Decree.

108.     The 2010 Consent Decree and its Scope of Work similarly misled the public about the scope of TCE contamination. As Section 1.1 of the Scope of Work states, Defendants were to implement "on-site, and if necessary, off-site remedial action of *impacted soils*" associated with the Site (emphasis added). Similarly, Paragraph 17 of the 2010 Consent Decree confirms it "does not include conducting a Feasibility Study for groundwater or implementing a remedy for impacted groundwater." The Consent Decree and Scope of Work then reinforced the false image that Springfield wells were at risk.

109.     Further, Defendants' 2020 Technical Update confirmed that all along, Defendants were aware that "[i]t is technically infeasible to hydraulically capture contaminant mass in the karst system under dynamic flow conditions." Ex. A at 82. In other words, Defendants were aware that containing the TCE plume under the Contamination Site was "infeasible." *Id.* This information should have been provided to the public, and certainly should have been provided prior to the entry of any Consent Decree, including the 2010 Consent Decree.

However, the above information was negligently, if not intentionally, withheld from the public, including prior to the entry of the 2010 Consent Decree.

110.     Upon information and belief, until 2018-2019, Defendants did not inform the Plaintiffs, the Classes, or the public that TCE had spread into the Springfield and Ozark Aquifers, and at least one known "private well."

111.     The Springfield and Ozark Aquifers provide well water to many residents of Springfield, including Plaintiffs and the Classes.

112.     An image provided in a 2020 Northrop Grumman report shows how wells from residences are drilled through both aquifers, and therefore, would collect water from one or both aquifers.



Ex. A at 42.

113.     Defendants were and are aware that TCE from the Contamination Site had spread into both the Springfield and Ozark Aquifer systems years before publicly announcing such contamination.

114.     As can be seen by progress reports made to the DNR, Defendants' remediation efforts—as early as 2011—included extracting and treating contaminated water from the Springfield Plateau Aquifer with plans to begin extracting and treating contaminated water from the Ozark Aquifer—the aquifer used more often for wells in the area.

**ACTIVITIES PLANNED FOR THE NEXT REPORTING PERIOD**

The following activities are scheduled for April 1, 2011 through June 30, 2011:

- Continue to extract and treat water from the Springfield Plateau Aquifer;
- Continue operation of the ERH system at the OAP treatment area;
- Conduct onsite meeting with MDNR representatives;
- Submit Percolation Terrace and A/B Lagoon RACR;
- Continue EISB progress monitoring of groundwater within the NAP treatment area;
- Continue Pre-ERH EISB activities at the OAP Treatment Area;
- Submit the Sanitary Lagoon FS;
- Submit technical memorandum for the Subfloor RI findings;
- Submit work plan for Ozark Aquifer IRM pump test in support of future extraction and post treatment re-injection; and
- Start Ozark Aquifer pump test activities.

Ex. E, Excerpt from Defendants' "Progress Report for the Period January 1, 2011 Through March 31, 2011" (highlights added).

**SIGNIFICANT DEVELOPMENTS AND ACTIVITIES PERFORMED DURING THE REPORTING PERIOD**

The following activities were initiated and/or continued during this reporting period:

- Continued evaluating building and equipment alterations necessary for the completion of the Ozark Aquifer IRM system;
- Installed the Ozark IRM piping underground from the treatment building to injection well MWO-6;
- Reconfigurated MWO-5 well head for a watertight seal with packer airline and sampling ports;
- Completed transformer installation and power drop to the OAP and MW-129;
- Dewatered the Decorative Pond and began removal of sediment in preparation for backfilling;
- Extracted and treated 668,755 gallons of water from the Springfield Plateau Aquifer;

Ex. F, Excerpt from Defendants' "Quarterly Progress Report for the Period October 1 Through December 31, 2012" (highlights added).

115.     The only reasonable belief as to why Defendants would extract and treat hundreds of thousands of gallons of water from these aquifers was because they were aware of significant TCE contamination from the Contamination Site.

116.     A 2016 report from the Defendants confirms the same.

**6.2    OZARK AQUIFER**

Wells IW-1, MWO-5, and the Airport deep well APD-1 have historically had detections with VOCs (TCE, cis-1,2 DCE, and 1,2-DCP) above groundwater objectives. The Ozark Aquifer IRM involves extraction from IW-1 and injection of the treated water into MWO-6 (or the City sewer).

MWO-05 and IW-1 were not sampled during 2016 groundwater monitoring event due to construction being done on MWO-05, therefore only APD-1 was sampled in 2016. The data for APD-1 continued to show detections of the contaminants of concern.

Ex. G, Excerpt from 2016 Groundwater Monitoring Report, Vol. I (Dec. 2017) at 6.1 (highlights added).

117.    Most shocking, Defendants had knowledge in at least 2004 that a "private well"

had TCE contamination from the Site. In more detail, Defendants began sampling the

"private well" in 2004, and, through the current date, detected unsafe TCE levels (above 5

ppb).

> **6.3      PRIVATE WELL**
>
> The untreated sample results for the private well sample collected on July 14, 2016 indicated an influent TCE concentration of 7.6 ppb.  Although the VOC results for this well vary over time, the pre-treatment VOC concentrations in the private well have been in a decreasing trend since samples were first collected in 2004. Other private wells sampled during this event were below MCL.  See **Appendix F** for a graph of the private well TCE detection trend. The treated water results were below the MCLs for VOCs.

*Id.* (highlights added).[8] In other words, the Defendants obtained actual knowledge that TCE

from the Site had spread to a "private well" starting in at least 2004 due to testing they or

their contractors performed.

118.    In fact, the "private well" tests conducted by Defendants show over a decade of

TCE measurements that exceeded MCL, including dating Defendants' knowledge of the

spread of TCE from the Site to a "private well" at least as early as June 18, 2004.

---

[8] While this 2016 report states the "concentrations in the private well have been in a decreasing trend since samples were first collected in 2004," later tests in 2019 (19.6 and 20) and 2020 (26.5 and 18) are actually *higher* than prior tests, confirming the "private well" is *not* in a decreasing trend.

**Appendix F Private Well TCE Detection Trend**

TCE Results in ug/L

| | 6/18/2004 | 11/30/2004 | 12/14/2004 | 5/24/2005 | 9/14/2005 | 10/12/2007 | 4/1/2008 | 9/25/2008 | 5/19/2010 | 6/30/2011 | 6/7/2012 | 5/23/2013 | 6/20/2014 | 7/1/2014 | 7/9/2015 | 12/16/2015 | 7/14/2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gerling IN | 11.0 | 14 | NS | 13 | <0.5 | NS | 8.6 | 11 | 6.3 | 11 | 4.4 | 8 | 2 | 5.2 | 6.2 | 8.9 | 7.6 |
| Gerling OUT | N/A | <0.5 | NS | <0.5 | NS | <0.5 | <0.5 | 0.5 | <1.0 | 0.73 | <0.5 | <5.0 | <1 | | | | <0.5 |
| Hennessy | 2.04 | NS | <0.5 | 2.4 | 1.8 | NS | <0.5 | 3.4 | NS | 0.97 | NS | NS | NS | NS | NS | NS | 4.2 |
| Marples | 1.42 | NS | 0.5 | 1.1 | 0.5 | NS | 1.2 | 1.1 | NS | NS | NS | NS | NS | NS | NS | NS | 0.68 |

Cis-1,2 DCE Results in ug/L

| | 6/17/2004 and 6/18/2004 | 11/30/2004 | 12/14/2004 | 5/24/2005 | 9/14/2005 | 10/12/2007 | 4/1/2008 | 9/25/2008 | 5/19/2010 | 6/30/2011 | 6/7/2012 | 5/23/2013 | 6/20/2014 | 7/1/2014 | 7/9/2015 | 12/16/2015 | 7/14/2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gerling IN | 1.38 | 1.9 | NS | 1.38 | NS | NS | 0.9 | 1.2 | <1.0 | 1.5 | 0.76 | <1.0 | <1 | <1.0 | <1.0 | 1.2 | <1.0 |
| Gerling OUT | N/A | <0.5 | NS | <0.5 | NS | <0.5 | <0.5 | <0.5 | <1.0 | <1.0 | <1.0 | <5.0 | <1 | <1.0 | <1.0 | <1.0 | <1.0 |
| Hennessy | <0.2 | NS | <0.5 | <0.5 | <0.5 | NS | <0.5 | <0.5 | NS | <1.0 | NS | NS | NS | NS | NS | NS | <1.0 |
| Marples | <0.2 | NS | <0.5 | <0.5 | <0.5 | NS | <0.5 | <0.5 | NS | <1.0 | NS | NS | NS | NS | NS | NS | <1.0 |

Exceeds MCL



*Id.,* Appendix F (highlights added). As these tests were performed by Defendants and/or their contractors, Defendants had actual knowledge of each "private well" test that exceeded the MDL in 2004, 2005, 2008, 2010, 2011, 2013, 2014, 2015, 2016, and beyond. Also, logically, because the Defendants and/or their contractors were performing such tests confirm they were aware the TCE contamination of the "private well" arose from the Site.

119.     Further evidence Defendants had actual knowledge that TCE from the Site contaminated the 2004 "private well" (and the Plaintiffs' wells) can be seen from a 2020 report prepared by the Defendants that admits TCE "from the Site" contaminated Domestic Wells "North of the Site near Fantastic Caverns" (which upon information and belief is where the 2004 Private Well is located) and "South of the Site" (namely, the Plaintiffs "York and Harvey wells").

1. How is TCE getting from the Site to Domestic Wells:
   a) East of the Site near Ritter Springs?
   b) North of the Site near Fantastic Caverns?
   c) South of the Site (York and Harvey Wells)?

Ex. A at 86. To reiterate: Defendants' documents confirm not only that the wells "North of the Site near Fantastic Caverns" (e.g., the 2004 "private well") and Plaintiffs' wells (by name) were contaminated by TCE from the Site, but that Defendants had knowledge of such contamination as well.

120.    Defendants' knowledge of offsite contamination due to TCE from the Site appears to arise even prior to 2004. At least as early as 2002, DNR sent Defendants a letter referring to its "grave concerns" that the TCE Contamination Site was "a contributing source of the VOCs found in Big Williams Spring and the Little Sac River at Fantastic Spring." Ex. I, 12/26/2002 DNR letter. DNR also explained that offsite contamination from the TCE Contamination Site could affect bodies of water "designated for Livestock & Wildlife Watering and Protection of Warm Water Aquatic Life and Human Health—Fish Consumption," and because William Spring is overflow for Fantastic Caverns that it could affect "unique fauna such as the Blind Ozark Cavefish" which is a "threatened and endangered species," the Blind Cave Crayfish, and other unique organisms. *Id.*

121.    Northrop Grumman was later sued by the State of Missouri in 2010 over the TCE Contamination Site which resulted in a Consent Decree. *2010 Consent Decree, Missouri v. Northrop Grumman Guidance & Elecs. Co*., No. 10-04268-CV-S-DGK, 2011 U.S. Dist. LEXIS 58606 (W.D. Mo. June 1, 2011).

122.     Despite allegedly having a notice and comment period on the 2010 Consent Decree, Defendants did not inform residents of Springfield that TCE had contaminated private wells in Springfield starting in at least 2004, that Defendants had at least five tests from 2004, 2005, and 2008 showing TCE levels above the MDL in a "private well," or that containing the contaminants from the Site was "infeasible." Rather, Defendants withheld these facts from the public. By withholding this information, Defendants made a proper notice and comment process impossible as Springfield residents were unaware not only that TCE could spread to their wells, but that multiple tests had already shown dangerous levels of TCE from the Site had indeed contaminated private wells in Springfield. Further, because the Scope of Work stated Defendants were to implement "on-site, and if necessary, off-site remedial action of impacted soils" (i.e., not groundwater) associated with the Site and Paragraph 17 of the 2010 Consent decree "does not include conducting a Feasibility Study for groundwater or implementing a remedy for impacted groundwater," not only misled the public into believing the scope of contamination—and need for remediation—was limited to *soil* at the Site, it also prevented actions or input from the public pertaining to treatment of groundwater.

123.     To state another way, at the time of the notice and comment period for the 2010 Consent Decree, Defendants made it appear that well owners were not at risk of TCE contamination then or in the future. Defendants, however, knew the opposite was true. Since Springfield was unaware of the actual TCE risk, they could not knowingly participate in the notice and comment period. Defendants therefore negligently, if not intentionally, provided improper notice of the 2010 Consent Decree by withholding known information that

dangerous levels of TCE from the Site had been found in private wells since 2004 and that containment of such contaminants from the site was infeasible.

124.    Further for the 2010 Consent Decree, Defendants provided no explanation about should TCE be found in private wells, what actions Defendants would perform. By withholding such information, Defendants failed to provide the community necessary information to participate in a fair notice and comment period.

125.    In 2013, due to its remedial actions and in response to the DNR suit, Defendants engaged in litigation against their insurers over payments related to the Springfield TCE Contamination Site. Ex. J, Palmer Aff. Within this lawsuit, an affidavit of Jill M. Palmer, Assistant General Counsel for "Northrop Grumman law department,[9]" was submitted. *Id.*, ¶1. According to this affidavit, Ms. Palmer "provided legal advice regarding environmental regulatory compliance and environmental property damage matters to Northrop employees including those at the Springfield facility." *Id.,* ¶3. Notably, Ms. Palmer was involved with defending Defendants against claims by DNR concerning the Springfield Contamination Site.

> Since approximately 2003, I have also been involved in defending Northrop against administrative enforcement and other claims brought and threatened by the State of Missouri and the Missouri Department of Natural Resources ("MDNR"), alleging that Northrop is liable under Missouri and federal laws for groundwater and other environmental property damage allegedly caused by operations, including the disposal and other releases of hazardous substances during the course of Northrop's historical operations at its Springfield facility, where Northrop manufactured printed circuit boards from 1964 to 2007.

---

[9] It appears Ms. Palmer was employed by the parent Northrop Grumman company and not Northrop Grumman Guidance and Electronics Company Inc. Despite this, it appears her legal advice was given to both companies without regard to maintaining corporate separateness.

*Id.,* ¶5. In referring to the 2002 DNR letter, the Palmer affidavit confirmed that Defendants were aware of offsite contamination from the TCE Contamination Site at least as early as 2002. *Id.,* ¶17.

126.     During trial against Defendants' insurers, Defendants' expert confirmed releases of TCE and copper from "various Areas of Concern" at the TCE Contamination Site caused groundwater contamination. *Northrop Grumman Guidance & Elecs. Co. v. Emplrs. Ins. Co. of Wausau,* 612 S.W.3d 1, 9 (Mo. Ct. App. 2020). Defendants also presented evidence confirming groundwater contamination at the Site. *Id.* at 16. Defendants therefore have known for years that TCE spread from the Site into Springfield.

127.     Despite this knowledge, Defendants failed to bring the contamination of the aquifers and of at least one "private well" to the public's attention until 2018-2019…and Defendants did this then only because Fantastic Caverns went public about TCE being detected in its cave system.

128.     Upon information and belief, for years Defendants hid from the public the fact that TCE was in private wells in Springfield and that containment of the TCE plume at the Site was infeasible.

129.     As noted in the report TCE levels in the private well have been allegedly "in a decreasing trend since samples were first collected in 2004." *Id.* Upon information and belief, Defendants kept the knowledge of private well contamination from the public hoping that as time progressed (and as TCE would disperse through the aquifers) that at some point, the TCE levels would be so diluted, they might fall below the MCL. If it were not for Fantastic Caverns going public, TCE contamination in private wells may never have come to light, and the public would still not know about TCE levels in their well water.

130.     Further, the fact that the 2004 "private well" has been in a "decreasing tend" confirms that while some recently tested wells are currently below the MCL, they were likely above the MCL prior to their 2018-2019 test dates.

131.     For example, documentation confirms that even for some of the recently tested "[w]ells with no TCE detects" there will still TCE "degradation products...detected." Ex. H, 2/19/2021 Litton Site Discussion outline.

132.     Worse for Defendants, documents obtained during discovery show more recent tests of the 2004 "private well" had results exceeding prior TCE levels, including a 6/28/2019 test at 19.6 ug/L, an 8/13/2019 at 20 ug/L, a 4/10/2020 test at 26.5 ug/L, and a 5/19/2020 at 18 ug/L.

133.     It was foreseeable, if not known, to the Defendants that since the Springfield and Ozark Aquifers and at least one "private well" were contaminated with unsafe levels of TCE, that wells within proximity to the Contamination Site would also be contaminated with TCE...some with unsafe levels.

134.     During this time, it was foreseeable, if not known, to the Defendants that since the Plaintiffs, Classes, and the public were unaware of TCE contamination, that Plaintiffs and the Class Members would drink, bathe, wash their clothing, and cook with well water.

135.     Upon information and belief, for over a decade, Plaintiffs' and the Classes' well water was contaminated with TCE.

136.     Upon information and belief, Plaintiffs and the Classes were exposed to higher levels of TCE than are now found in their wells.

137.     The longer people are exposed to unsafe levels of TCE, the more chance they have of becoming ill.

138.     As just one example, TCE is known to affect fetal and kidney tissue, and give rise to spontaneous abortions. Plaintiff Alisha York Stradling spent a lot of time working at her 2225 North Plainview Avenue address. When she was pregnant while working there between 2017-2018, she made a concerted effort to drink water for her and her babies' health. Unfortunately, during this time, she had four miscarriages, including one of the twins she was carrying. The twin that survived was born with a horse-shoe shaped kidney.

139.     Upon information and belief, exposure to TCE from the site caused Plaintiff's miscarriages and her daughter's horse-shoe shaped kidney.

140.     Had Alisha York Stradling been informed of the risks of TCE in her well's water, she would have not used the well water, or, at a minimum, would have had the well water tested prior to drinking such water. However, because Defendants hid their actual knowledge of TCE spread from the Site into private wells, she was never afforded that opportunity. In other words, the only reason for her miscarriages was because Defendants failed to warn of the risk of TCE contamination in private wells from the Site.

141.     As the "responsible parties" for the Contamination Site, Defendants had a reasonable duty to timely inform Plaintiffs, the Classes, and the public about TCE contamination in private wells starting in at least 2004.

142.     For example, because 2004 tests conducted by Defendants and/or their contractors showed unsafe levels of TCE *from the Site for which they were legally responsible* had contaminated at least one "private well," and knowing that TCE in well water posed significant risks to the health of those who used contaminated well water, a duty arose at least as of June 2004 for Defendants to inform the public 1) TCE from the Site had contaminated privates wells in Springfield and 2) due to the TCE contamination from the Site

38

into private wells, well-owners should test (or have tested) their well water prior to continuing their use.

143.    Positive TCE tests for TCE from the Site continued *for years* after 2004, reinforcing that Defendants' duty arose and continued until 2018-2019 when Defendants finally informed the community of the TCE contamination from the Site.

144.    Defendants were also aware that contamination found in the "private well" was from the Site as shown by their repeated testing of the well for over a decade and from admissions made to DNR. See, e.g., Ex. A at 86 (Northrop presentation to DNR asking "How is TCE getting *from the Site to Domestic Wells*" "North of the Site Near Fantastic Caverns?" which is where the 2004 Private Well is located). (Emphasis added).

145.    Defendants are and were aware of what proper notification of contamination due to TCE from the Site should have been. After TCE from the Site was found at Fantastic Caverns, the Springfield community was notified in 2018-2019. With this notification, the Springfield community was told of the contamination to well water in Springfield, and that their wells should be tested.

146.    Upon information and belief, the only reason Defendants notified the community of such contamination in 2018-2019 was because Fantastic Caverns went public about TCE contamination from the Site at its cave system. In other words, Defendants acted not out of their duty, but because they were caught.

147.    The facts that should have been reported were known to Defendants; Defendants conducted the tests that found TCE in the "private well" in at least 2004, 2005, 2008, 2010, 2011, 2013, 2014, 2015, 2016, and beyond. Defendants not only should have known these facts, they had actual knowledge of these facts.

148.     Defendants' duty arose under the common law and under the applicable consent decrees. For example, ¶48 of the 2010 Consent Decree states, "If any incident or change in the condition of the Site occurs during the implementation of Work conducted pursuant to this Consent Decree that causes or threatens to cause an additional release of Hazardous Substances from the Site or an endangerment to the public health, welfare or the environment, Settling *Defendant shall immediately take all appropriate action*." (Emphasis added). At a minimum, Defendants knew TCE from the Site contaminating private wells caused "endangerment to the public health, welfare or the environment," and therefore Defendants were required to "immediately take all appropriate action" which included, at a minimum, informing the Springfield community that TCE from the Site had contaminated private wells in the community, and that the community should have their wells tested prior to using well water.

149.     Defendants breached their duties by withholding their knowledge of TCE contamination to private wells from the public for years, and then only informing the community after the discovery of TCE at Fantastic Caverns forced their hand.

150.     DNR admitted for itself and necessarily for Defendants that they breached their duty to warn.

> "For those people for whom this came as a surprise, especially for those who had TCE in their (water) wells and didn't know it, I apologize," Galbraith said. "We didn't tell people about it in a timely manner. We're here in part to make amends."[10]

---

[10] "DNR official at public forum: 'I apologize' for how Missouri handled TCE pollution," Springfield News-Leader (2019) from https://www.news-leader.com/story/news/local/ozarks/2019/03/15/springfield-greene-county-pollution-dnr-tce-litton-systems/3133068002/ (last viewed June 4, 2021).

151.     Defendants did not timely warn Plaintiffs or the Classes that TCE from the Site

had contaminated private wells. Because of their failure to timely warn, Plaintiffs and the

Classes were exposed to TCE, at a minimum from their well water, including exposures to

higher concentrations of TCE from 2004-2018 than their 2018-2019 positive tests show (in

line with the alleged decreasing trend of the 2004 "private well" test). In view of these years

of exposure, it is now time for Defendants to make amends.

**<u>Defendants' Negligently Performed Tasks Required by the Consent Decree</u>**

152.     Although discovery in this action is still in its early stages, evidence produced

already confirms Defendants negligently performed tasks required by the Consent Decree.

153.     For example, Defendants had a duty to comply with local, state, and federal laws

and regulations. According to ¶47 of the 2010 Consent Decree, "Settling Defendant shall

perform all Work required pursuant to this Consent Decree in accordance with all applicable

local, state, and federal laws and regulations; except as provided in Section 121(e) of

CERCLA, 42 U.S.C. § 9621(e), and 40 C.F.R. § 300.430(f)." Despite this, Defendants

continually violated Missouri Clean Water Law, Section 644.051.1(3) and 644.076.1, Clean

Water Commission Regulation 10 CSR 20-7, and their Missouri State Operating Permit

(MSOP).

154.     For example, discovery has shown Defendants received numerous Notices of

Violation and Warning Letters from DNR due to Defendants' exceedance of effluent

limitations established in their MSOP from at least 2002 through 2013, including for

"significant noncompliance" and "major exceedance." See, e.g., Group Ex. M at 2,[11] June 8,

---

[11] Page numbers provided for Group Ex. M are counted from the PDF page (including the cover page as page one) and by Defendants' Bates number.

2002 Notice of Violation #6374SW (NGC00012322) ("After review of your discharge monitoring report(s)(DMR), it has come to our attention that the effluent limitations in your National Pollutant Discharge Elimination System (NPDES) permit have been exceeded…Exceeding these limitations are violations of the Missouri Department of Natural Resources Regulation 10 CSR 20-7.015 'Effluent Regulations' and NPDES permit conditions. The enclosed Notice of Violation 6374SW is *for significant noncompliance* with one or more of the parameters identified above and shall serve as official notification of this noncompliance." (emphasis added)); at 5, Dec. 2, 2002 Notice of Violation #6961SW (NGC00012319) (again for "significant noncompliance"); at 8, March 13, 2003 Notice of Violation #7820SW (NGC00012316) (again for "significant noncompliance"); at 11-12, June 18, 2007 Notice of Violation 12078SW (NGC00011438-9) (for "*major exceedance* of one or more of the parameters identified above and shall serve as official notification of this noncompliance" (emphasis added)); at 14, May 25, 2010 Letter of Warning (NGC00012398) ("After review of your Discharge Monitoring Report(s)(DMR), it has come to our attention that the effluent limitations in your Missouri State Operating Permit (MSOP) have been exceeded…Exceeding this limitation is a violation…"); at 16, Aug. 30, 2010 Letter of Warning (NGC00004020) (Same); at 19, May 31, 2011 Notice of Violation 13620SW (NGC00010991) ("A review of your Discharge Monitoring Report(s) (DMR) for the monitoring period ending in 1st quarter, January through March 2011 shows that the effluent limitations established in your Missouri State Operating Permit (MSOP) have been exceeded…An exceedance of the effluent limitations established in your permit is a violation of the Missouri Clean Water Law, Section 644.051.1(3) and 644.076.1, Clean Water Commission Regulation 10 CSR 20-7 and your MSOP. The facility is responsible for taking

appropriate steps to eliminate the violation(s)"); at 20, Aug. 8, 2011 DNR Communication to Defendants (NGC00011049) ("In reviewing the file for your stormwater/wastewater treatment facility I note that you have failed to submit the Discharge Monitoring Report (DMR) for the 2nd quarter, April through June 2011 required by your Missouri State Operating Permit (MSOP)"); at 21, Aug. 25, 2011 Notice of Violation 13800SW (NGC00012394) ("Permittee failed to comply with effluent limits…"); at 22, Dec. 22, 2011 Notice of Violation 14000SW (NGC0000014) ("A review of your Discharge Monitoring Report(s) (DMR) for the monitoring period ending in 3rd quarter, July through September 2011 shows that the effluent limitations established in your Missouri State Operating Permit (MSOP) have been exceeded…An exceedance of the effluent limitations established in your permit is a violation of the Missouri Clean Water Law, Section 644.051.1(3) and 644.076.1, Clean Water Commission Regulation 10 CSR 20-7 and your MSOP. The facility is responsible for taking appropriate steps to eliminate the violation(s)"); at 23, March 30, 2012 Notice of Violation 14143SW (NGC00010099) ("A review of your Discharge Monitoring Report(s) (DMR) for the monitoring period ending in 4th quarter, October through December 2011 shows that the effluent limitations established in your Missouri State Operating Permit (MSOP) have been exceeded…An exceedance of the effluent limitations established in your permit is a violation of the Missouri Clean Water Law, Section 644.051.1(3) and 644.076.1, Clean Water Commission Regulation 10 CSR 20-7 and your MSOP. The facility is responsible for taking appropriate steps to eliminate the violation(s)"); at 25, June 20, 2012 Notice of Violation 14223SW (NGC00006262) ("Permittee failed to comply with effluent limits…"); at 26, Sept. 10, 2012 Letter of Warning (NGC00000221) ("A review of your Discharge Monitoring Report(s) (DMR) for the monitoring period ending in 2nd quarter,

April through June 2012 shows that the effluent limitations established in your Missouri State Operating Permit (MSOP) have been exceeded…An exceedance of the effluent limitations established in your permit is a violation of the Missouri Clean Water Law, Section 644.051.1(3) and 644.076.1, Clean Water Commission Regulation 10 CSR 20-7 and your MSOP. The facility is responsible for taking appropriate steps to eliminate the violation(s)"); at 27, Dec. 13, 2012 Notice of Violation 14536SW (NGC00000214) ("A review of your Discharge Monitoring Report(s) (DMR) for the monitoring period ending in 3rd quarter, July through September 2012 shows that the effluent limitations established in your Missouri State Operating Permit (MSOP) have been exceeded…An exceedance of the effluent limitations established in your permit is a violation of the Missouri Clean Water Law, Section 644.051.1(3) and 644.076.1, Clean Water Commission Regulation 10 CSR 20-7 and your MSOP. The facility is responsible for taking appropriate steps to eliminate the violation(s)"); at 30, May 28, 2013 Letter of Warning (NGC00010431) ("A review of your Discharge Monitoring Report(s) (DMR) for the monitoring period ending in 1st quarter, January through March 2013 shows that the effluent limitations established in your Missouri State Operating Permit (MSOP) have been exceeded…An exceedance of the effluent limitations established in your permit is a violation of the Missouri Clean Water Law, Section 644.051.1(3) and 644.076.1, Clean Water Commission Regulation 10 CSR 20-7 and your MSOP. The facility is responsible for taking appropriate steps to eliminate the violation(s)"); at 31, May 28, 2013 Notice of Violation 14714SW (NGC00009584) ("A review of your Discharge Monitoring Report(s) (DMR) for the monitoring period ending in 1st quarter, January through March 2013 shows that the effluent limitations established in your Missouri State Operating Permit (MSOP) have been exceeded…An exceedance of the

effluent limitations established in your permit is a violation of the Missouri Clean Water Law, Section 644.051.1(3) and 644.076.1, Clean Water Commission Regulation 10 CSR 20-7 and your MSOP. The facility is responsible for taking appropriate steps to eliminate the violation(s)"); at 33, Aug. 29, 2013 Notice of Violation 14926SW (NGC00009523) ("A review of your Discharge Monitoring Report(s) (DMR) for the monitoring period ending in 2nd quarter, April through June 2013 shows that the effluent limitations established in your Missouri State Operating Permit (MSOP) have been exceeded…An exceedance of the effluent limitations established in your permit is a violation of the Missouri Clean Water Law, Section 644.051.1(3) and 644.076.1, Clean Water Commission Regulation 10 CSR 20-7 and your MSOP. The facility is responsible for taking appropriate steps to eliminate the violation(s)"); at 37, Dec. 28, 2012 Report of Inspection (NGC00012403) ("Due to the number of instances or severity of the effluent limit exceedances, *the facility meets the criteria of significant non-compliance as defined by the U.S. Environmental Protection Agency (EPA)*" (emphasis added)).

155.     Further, a Detailed Facility Report obtained from a FOIA request to the EPA confirmed that in 10/01-12/31/20, the Site was in "Reportable Noncompliance." Ex. N at 5. While the cause and extent of this "Reportable Noncompliance" is not provided in the summary report, discovery will provide such details. Further, this same report notes a "CWA" (Clean Water Act) "Violation Identified" in what appears to be a May 15, 2018, inspection. *Id.,* at 3. Given the dates of both events, they appear to be different violations. However, the identification and scope of these violations will be determined in discovery.

156.     Additionally, an EPA inspection report from Dec. 20, 2010, referenced a "12/6/2005" inspection by the EPA where "Five violations were observed for management of

satellite accumulation containers, job descriptions and incomplete manifests…" Ex. P, Dec. 20, 2010 EPA Memorandum at 1.

157.    As shown, Defendants repeatedly failed to comply with laws and regulations as required by the Consent Decree in at least 2002, 2003, 2007, 2010-2013, 2018, and 2020. Defendants' actions under the Consent Decree therefore were negligently performed and/or Defendants negligently performed their obligations.

**Defendants' activities show they should not be treated as separate entities and that they are all responsible parties.**

158.    Identity-blurring activities by the Defendants confirm they should be treated as the same entity and all responsible parties for the TCE Contamination Site.

159.    The Defendants' activities are commingled and blurred, including (as discussed above) legal advice given to multiple Northrop Grumman entities without regard for corporate separation.

160.    Employees from various Northrop Grumman entities also monitor and run the day-to-day operation and remediation of the TCE Contamination Site including Northrop Grumman Corporation. For example, Exhibit D to the Amended Complaint is Notes from a monthly coordination call between DNR and Defendants. The LinkedIn profiles of two attendees (John Kehs and Anthony Mazzella) confirm they are "Northrop Grumman Corporation" employees. Ex. K, Kehs and Mazzella LinkedIn Profiles. Along these same lines, documents obtained from a sunshine request confirm Mazzella and Kehs' work email addresses are @ngc.com.

161.    Beyond the parent Northrop Grumman Corporation parent entity and "responsible party" Northrop Grumman Guidance and Electronics Company Inc., other Northrop

Grumman entities are also responsible for the operations at the TCE Contamination Site. For example, the 2020 Technical Update and Conceptual Path Forward presentation from "Northrop Grumman Mission Systems" (discussed above) provides detailed explanations of past and future activities of the Defendants at the TCE Contamination Site. Ex. A. Further, a draft Property Access Agreement between Defendants and Fantastic Caverns (obtained by a sunshine request from DNR) confirm that "notices required under this Agreement" should be sent to "Northrop Grumman Systems Corporation" and "Northrop Grumman Mission Systems"—not to Northrop Grumman Guidance and Electronics Company Inc. Ex. L at PDF page 5 of 8. Additionally, a draft Cost Disbursement Agreement (also obtained by sunshine request) states that the "Release and Discharge[d]" party is "Northrop Grumman Mission Systems"—again, not Northrop Grumman Guidance and Electronics Company Inc. *Id.* at PDF page 6 of 8. This document also appears to confirm commingling of funds between Defendant corporations.

162.     Finally, "responsible party" Northrop Grumman Guidance and Electronics Company Inc. appears to be undercapitalized with yearly sales of only $66 million. Such revenue is unlikely to allow it to continue operating given the Defendants' involvement with TCE contaminated sites in additional jurisdictions including New York, [12] Massachusetts, [13] and North Carolina.[14] Facing payments to cover remediation efforts in multiple jurisdictions

[12] *The Grumman Plume, Decades of Deceit,* Newsday, Feb. 18, 2020 available at https://projects.newsday.com/long-island/plume-grumman-navy/ (last visited Dec. 6, 2021).
[13] *State points finger at Northrop Grumman for groundwater contamination in Newton*, The Boston Globe, Oct. 5, 2016 from https://www.bostonglobe.com/metro/regionals/west/2016/10/05/state-likely-sources-groundwater-contamination-newton/RuafWkefc773A53qEY0kyM/story.html (last visited 12/6/2021).
[14] *J&P Dickey Real Estate Family Ltd. P'ship v. Northrop Grumman Guidance & Elecs. Co.*, No. 2:11cv37, 2012 U.S. Dist. LEXIS 36497, at *2-4 (W.D.N.C. Mar. 19, 2012)

and potential large damages judgments, it does not appear to have sufficient capital to support its liabilities. This is emphasized by its long-running lawsuit (the lawsuit appeared to be ongoing eight years later) against its insurers to cover payments for the Contamination Site.

**Class Allegations**

163.    Plaintiffs bring this action for themselves individually and as representatives of a class of all other similarly situated plaintiffs. Plaintiffs intend to seek certification of four classes: (a) an Owner-Occupant Class and (b) a Tenant Class both of whom used well water on their property any time from 2004 until present within the geographic range where DNR is currently offering free water well testing for TCE and (c) an Owner-Occupant Class and (d) a Tenant Class who have used private wells on their property any time between 2004 until present with a 10-mile radius of the Contamination Site.

164.    Plaintiffs initially describe the Well-Water-Testing-Area Owner-Occupant Class as:

> All persons who 1) own(ed) or reside(d) on real property in the geographic area of Springfield where DNR is offering free water well testing for TCE and 2) used well water on their property any time from 2004 until present.

165.    Plaintiffs initially describe the Well-Water-Testing-Area Tenant Class as:

> All persons who 1) are legal tenants and reside(d) on real property in the in the geographic area of Springfield where DNR is offering free water well testing for TCE and 2) used well water on their property any time from 2004 until present.

166.    Plaintiffs initially describe the 10-Mile-Radius Owner-Occupant Class as:

> All persons who own(ed) or reside(d) on real property within 10 miles of the Contamination Site who have used well water from their property at any time from 2004 until present.

167.     Plaintiffs initially describe the 10-Mile-Radius Tenant Class as:

All persons who are legal tenants and reside(d) on real property within 10 miles of the Contamination Site who have used well water from their property at any time from 2004 until present.

168.     Plaintiffs expect to further define the above owner-occupant and tenant classes prior to seeking class certification.

169.     Excluded from the classes above are Defendants and any of their officers or directors and immediate families, the Court and its immediate family, and any other individuals who have brought individual lawsuits arising from the same allegations against the Defendants.

170.     Plaintiffs reserve the right to amend or modify the class definitions and/or to move for certification of a class or classes defined differently than set forth above depending on the facts or law as discovered in this action.

171.     The four classes are sufficiently numerous that joinder of all members of the class is impracticable. The exact number and identity of all class members may be ascertained by appropriate discovery, but it is Plaintiffs' belief that the proposed classes comprise at least 74 locations where TCE was found by DNR tests. Class members may be notified of the pending action by email, mail, and by publication, as necessary.

172.     There are questions of fact and law common to the class(es), which common questions predominate over questions affecting only individual members. The common questions include, but are not limited to, the following:

a. whether obligations imposed by the Defendants by the consent decrees were negligently performed at the Site;
b. whether TCE spread from the confines of the Contamination Site;
c. identification of the precise geographic area of impact of the TCE spread from the Site;

49

d. whether the TCE spread from the Contamination Site constitutes an additional threat of exposure to chemical and/or industrial waste beyond the proximity of the Site;

e. when did Defendants become aware that TCE had spread from the Contamination Site,

f. the scope of the duties owed by Defendants to those who now have TCE contamination on their properties, including, but not limited to, a duty of non-negligently performing their obligations under the Consent Decree as well as a duty to warn of the spread of TCE from the Site, and

g. whether an injunction for medical monitoring would be appropriate for class members whose wells were contaminated with TCE from the Contamination Site.

173.    The claims of the representative Plaintiffs are typical of the claims of the members of the classes. Plaintiffs, like all other members of the Classes, have sustained legal injuries arising from Defendants' conduct, as alleged herein. The representative Plaintiffs and the members of the classes have suffered and continue to suffer similar or identical injuries in fact caused by the same unlawful conduct engaged in by Defendants.

174.    Plaintiffs can and will fairly and adequately represent the interests of the classes and have no interests that conflict with or are antagonistic to the interests of the class. Plaintiffs have retained attorneys who are highly skilled, competent, and experienced in environmental, complex and class action litigation, and who will vigorously assert the claims on behalf of the class members. No conflict exists between Plaintiffs and the classes. Plaintiffs are willing and able to vigorously prosecute this action on behalf of the classes.

175.    The class action is an appropriate method for the fair and efficient adjudication of this controversy given the following:

a. common questions of fact and law predominate over any individual questions that may arise, such that the class action mechanism is superior to other available means for the fair and efficient adjudication of this dispute;

b. there will be enormous economies to the Court and the parties in litigating the common issues in a class action instead of in multiple individual claims;

c. class treatment is required for optimal resolution of this matter and for limiting the court-awarded reasonable l egal expenses incurred by class members;

d. if the size of individual class members' claims are small, their aggregate volume, coupled with the economies of scale in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost-effective basis, especially when compared with the cost of individual litigation; and

e. the trial of this case as a class action will be fair and efficient because the questions of law and fact which are common to the Plaintiff Class(es) predominate over any individual issues that may arise.

176.　　Plaintiffs will seek to certify a Medical Monitoring Class for all the Owner-Occupant and Tenant Classes.

177.　　While residing in Springfield, Plaintiffs and the Class were exposed to TCE from a single source: Defendants' TCE Contamination Site.

178.　　Through their long history of dealing with TCE sites, Defendants knew that exposure to TCE caused at least diseases of the kidneys; liver; lymphatic, immune, nervous, and male reproductive systems; and fetal tissue.

179.　　In more detail, TCE has been associated with leukemia, liver cancer, multiple myeloma, end-stage renal disease, Parkinson disease, scleroderma, kidney cancer, non-Hodgkin's lymphoma, cardiac defects, choanal atresia, eye defects, low birth weight, fetal death, major malformations, miscarriage, neural tube defects, oral cleft defects, small size for gestational age, breast cancer, cervical cancer, esophageal cancer, lung cancer, Hodgkin's disease, ovarian cancer, prostate cancer, rectal cancer, impaired immune system function, neurological effects (such as delayed reaction times problems with short-term memory, visual perception, attention, and color vision), neurobehavioral performance deficits (i.e., delayed recall and deficits in visual perception), decreased blink reflex, and mood effects (i.e., confusion, depression and tension), and severe, generalized hypersensitivity skin disorder (an autoimmune-related disease).

51

180.     As described above, despite their knowledge, Defendants withheld information regarding TCE exposure to residents of Springfield due to TCE escape from the contamination Site and contamination of private wells.

181.     As the responsible parties for the site, Defendants had a duty to warn the Plaintiffs and the Class that TCE had escaped the Site as well as a duty to non-negligently perform the obligations imposed upon them by the consent decrees.

182.     The Defendants failed to use due care under the circumstances and were thereby negligent in the performance of their duties to Plaintiffs and the Class.

183.     As a proximate cause of Defendants' negligence and tortious conduct, Plaintiffs and the Class suffer from diseases that have not yet fully manifested.

184.     Medical monitoring procedures are reasonably necessary to enable Plaintiffs and the Class to obtain diagnostic testing for early detection and treatment of latent injuries or disease that may develop as a result of years' long exposure to TCE from the Site.

185.     Plaintiffs and the Class will therefore seek an injunction and/or other equitable relief from this Court creating a Court-supervised, Defendant-funded, comprehensive medical monitoring program for Plaintiffs and the Class, which includes but is not limited to the following:

1.  Establishment of a trust fund, in an amount to be determined, to pay for medical monitoring of all past, current, and future persons whose property and/or well water tests positive for TCE; and,

2.  Notification to all Class Members in writing that they may require frequent medical monitoring.

186.     Plaintiffs and the Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the increased risk of long term physical and economic losses associated with the diseases associated with TCE as a result of exposure to TCE from the Site.

187.     Plaintiffs will therefore seek judgment against Defendants, in excess of the jurisdictional limit and as determined at trial, for compensatory damages against all Defendants to establish a medical monitoring program for class members in order to recover medical expenses reasonably certain to be incurred in the future for costs of reasonably necessary diagnostic testing for early detection and treatment of latent injuries or disease that may develop as a result of exposure to TCE from the Site.

## Tolling and Estoppel

188.     Plaintiffs' causes of action did not arise until Plaintiffs discovered, or by the exercise of reasonable diligence should have discovered, that they were injured by Defendants' actions. Plaintiffs did not and could not have discovered that other private wells were contaminated with TCE. For example, upon information and belief, only Defendants and DNR were in possession of test results showing that as early as 2004, at least one private well in Springfield tested positive for TCE. Defendants hid such information from the public.

189.     Further, Plaintiffs' and the Classes are suffering continuous injury from the Site as TCE still appears in their wells.

190.     The applicable statutes of limitations have been tolled by Defendants' knowing and active concealment of the material facts regarding the actual state of TCE contamination in Springfield's aquifers and private wells. Defendants kept Plaintiffs and the members of the

Classes ignorant of the vital information essential to pursue their claims, without any fault or lack of diligence on the part of Plaintiffs and Class members.

191.     Defendants are and were under a continuous duty to disclose to Plaintiffs and the members of the Classes the true extent of TCE contamination from the Contamination Site. At all relevant times, Defendants concealed the true character, quality, and nature of the TCE contamination spreading from the Contamination Site.

192.     Based on the foregoing, Defendants are estopped from relying on any statutes of limitation in defense of this action.

193.     Pursuant to the doctrines of Equitable Tolling, Equitable Estoppel, Fraudulent Concealment and the Discovery Rule, the period for bringing claims shall not be barred due to any statute of limitations or statute of repose. With respect to each cause of action asserted herein, Plaintiffs expressly plead Equitable Tolling, Equitable Estoppel, Fraudulent Concealment and the Discovery Rule and their application thereto.

194.     All conditions precedent to the filing of this Complaint have been satisfied. This action has been filed prior to the expiration of any applicable statute of limitations or statute of repose.

## Claims

### Count I - Negligence (All Four Owner-Occupant and Tenant Classes)

195.     Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

196.     Defendants owed and owe a duty to use reasonable care to avoid causing injury to others in the operation and/or remediation of the Contamination Site, including to non-negligently comply with the requirements of all Consent Orders.

54

197.     Defendants also owed and owe a duty to warn others should TCE spread from the Contamination Site.

198.     Defendants owed these duties to Plaintiffs and to the members of the Classes.

199.     Based on the proximity of Plaintiffs' and the Classes' property to the Contamination Site, it was reasonably foreseeable to Defendants that Plaintiffs would be injured by the spread of TCE from the Site, and the failure of Defendants to properly warn of such TCE spread.

200.     Defendants breached this duty to Plaintiffs and the Classes by acts and/or omissions, including but not limited to:

1.  Failure to warn others that Defendants were aware that TCE from the Site had contaminated private wells starting in at least 2004, and

2.  Failure to non-negligently perform obligations imposed upon them by the consent decrees.

201.     The foregoing negligent act(s) and/or omission(s) by Defendants are the proximate cause of injuries suffered by Plaintiffs and the Classes.

202.     Further, the contamination and spread of TCE and injuries to Plaintiffs do not ordinarily occur in the absence of negligence.

203.     The Contamination Site is controlled, owned, and operated by Defendants, and has been for at least two decades.

204.     Defendants are also legally responsible for the Contamination Site.

205.     As of 1982, nearby wells were not contaminated with TCE.

206.     In 2004, however, Defendants found at least one "private well" that tested above the MCL for TCE.

207.	The spread of TCE from the contamination site to at least private wells is due to Defendants' actions.

208.	Defendants possess and possessed superior knowledge regarding the status of the remediation of TCE at the Contamination Site as well as the spread of TCE from the Contamination Site, including the cause of the spread of TCE from the Contamination Site.

209.	Plaintiffs and members of the classes have been injured by Defendants' negligence as described above. For example, Plaintiffs and members of the Classes are unable to utilize their well-water. Plaintiffs' injuries also include damage to their use and enjoyment of the property, value of the property, other economic loss and discomfort and annoyance.

210.	Defendants were aware that TCE had spread from the contamination site into at least one "private well" for over a decade before informing Plaintiffs and the Class. During this time of inaction on Defendants' behalf, Plaintiffs and the Classes utilized well water containing TCE. Exposure to unsafe levels of TCE or long-term exposure can cause serious health issues. By failing to timely notify the Plaintiffs and the Classes of the spread of TCE to the Plaintiffs and the Classes attention, Defendants put many at risk of health issues related to TCE.

211.	Defendants conduct as described above was outrageous because of its evil motive, or reckless indifference to the rights of Plaintiffs and those similarly situated.

212.	Defendants knew starting in at least 2004 there was a significant risk that Plaintiffs and the Classes would be exposed to TCE, at a minimum through contaminated well water.

213.     Defendants violated their duty to provide a reasonable and adequate warning of the dangers inherent and reasonably foreseeable by the known spread of TCE from the Contamination Site (e.g., the 2004 private well tests), at a minimum to Plaintiffs and the Classes concerning use of Plaintiffs and the Classes' well water.

214.     Plaintiffs, and those similarly situated, each seek punitive damages from Defendants due to the above-described actions.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and members of the Classes request that the Court enter an Order or judgment against Defendants as follows:

A.  Certifying the Owner-Occupant and Tenant Classes described herein and appointing Plaintiffs and their counsel to represent the Classes;

B.  Awarding Plaintiffs and other members of the Classes damages and all other relief available under the claims alleged;

C.  Awarding Plaintiffs and other members of the Classes pre-judgment and post judgment interest as a result of the wrongs complained of herein;

D.  Enjoining Defendants as described herein;

E.  Awarding Plaintiffs and the members of the Classes punitive damages due to Defendants' behavior;

F.  Awarding Plaintiffs and other members of the Classes their costs and expenses in this litigation, including reasonable attorneys' fees and other costs of litigation; and

G.  Awarding such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.


Dated: June 1, 2022                    PEIFFER WOLF CARR KANE & CONWAY

By:      *s/Paul Lesko*
         Paul Lesko (MO Bar No. 51914)
         818 Lafayette Avenue
         Second Floor
         St. Louis, MO 63010
         Telephone: (314) 833-4826
         plesko@peifferwolf.com