IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

DON YORK, *et al.*,

        Plaintiffs,

v.

NORTHROP GRUMMAN GUIDANCE AND
ELECTRONICS COMPANY, INC., *et al.*,

        Defendants.

No. 21-03251-CV-S-BP

## ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS

Pending is Defendants' Motion to Dismiss. The Court has considered the parties' written arguments and the arguments presented at the hearing on August 23, 2022. As set forth below, the Motion to Dismiss, (Doc. 47), is **GRANTED IN PART**.

### I. BACKGROUND

This case arises from the operations of Litton Systems Inc., ("Litton"), at its manufacturing facility in Springfield, Missouri, ("the Site"). According to the Second Amended Complaint, Litton began manufacturing printed circuit boards at the Site in the 1960s, and part of the process involved the use of tricholorethyline, ("TCE"), which is a carcinogen.[1] Litton's method for containing the TCE proved unsuccessful, and in 1982 the State of Missouri filed suit. That suit was settled, with Litton paying a fine and being required to engage in various efforts to remediate the contamination. (Doc. 44, ¶ 37.) The settlement also required Litton to construct a network of monitoring and extracting wells to be placed under the State's oversight, through the Missouri

---

[1] The Court acknowledges the Second Amended Complaint's footnote in the Introduction that other contaminants were released as well. (Doc. 44, ¶ 3 n.1.) But Plaintiffs concede "the focus of this [Second Amended C]omplaint is on TCE," *id.*, and the only contamination alleged to exist in their wells is TCE. (Doc. 44, ¶¶ 81, 83.) Thus, while the footnote indicates (and Plaintiffs contended during the hearing) that contaminants other than TCE are at issue, this contention is not supported by the remainder of the Second Amended Complaint.

Department of Natural Resources, ("MDNR"). (Doc. 44, ¶ 38.) At the time, there was no indication that any private wells had been contaminated, although it was understood that contamination could occur if the TCE was not contained and seepage continued. (*See* Doc. 44, ¶ 36.)

In 1990 or 1991, contamination was discovered on the Site, which was later reported to MDNR. (Doc. 44-10, ¶¶ 9-11.) This led the State and Litton to enter a Consent Agreement in 1993. (Doc. 44-10, ¶ 12.) As relevant to this suit, the 1993 Consent Agreement provides that Litton "shall notify the MDNR immediately upon the occurrence of any event, which, in Litton's judgment, may threaten human health or the environment" and then provide a written notice "which explains the event, any action taken to eliminate the threat, and the precautions to avoid recurrence of a similar event." (Doc. 47-2, § VII.) Defendants acquired the Site in 2001 and assumed Litton's responsibilities under the prior settlements with the State (including the 1993 Consent Agreement).

In 2004, testing conducted by Defendants (at MDNR's behest, *see* Doc. 47-4, p. 3) revealed that a private well had been contaminated with TCE. (Doc. 44, ¶¶ 117-19, 132.) This information was conveyed to MDNR, (*see* Doc. 47-3, pp. 25, 327-31),[2] but was not publicly announced until sometime in 2018.[3]

---

[2] The Court may take judicial notice of documents filed with the State and of public records, so it can consider these materials when ruling on Defendants' motion. Plaintiffs object on the ground that judicial notice cannot be used to resolve disputed facts or to establish that facts contained within the documents are true. (Doc. 50, pp. 15-16.) However, the Court is not taking judicial notice of these documents to establish the accuracy of the scientific information contained in them; it is taking judicial notice of these documents to establish what information MDNR purportedly possessed – which are facts that do not seem to be in dispute.

[3] In 2010, the State sued Defendants because contamination spread from the Site, and that suit was settled via a Consent Decree in 2011. Details about the 2010 suit and the 2011 Consent Decree are not relevant to the issues presently before the Court, but they were discussed in the Court's Order addressing Defendants' Motion to Dismiss directed to the First Amended Complaint. (Doc. 43, pp. 2-3.) The Court will, however, occasionally use the term "settlements" to refer to both the 1993 Consent Agreement and the 2011 Consent Decree.

In 2016 or 2017, DNR conducted tests at a tourist attraction known as "Fantastic Caverns" and discovered TCE vapor had seeped into the cave system. (Doc. 44, ¶ 46.) In 2018, MDNR began testing wells around the Site and discovered some had been contaminated with TCE. MDNR then offered free testing to property owners near the Site, which resulted in more positive tests. (Doc. 44, ¶¶ 47-50.) "Where tests have found TCE in private wells, DNR and Defendants have scheduled either quarterly or monthly follow ups to continue testing the wells." (Doc. 44, ¶ 52.)

Plaintiffs are individuals who own or lease property in Springfield, Missouri. Don and Beverly York purchased their property in 2006; their daughter and husband are tenants on the property. Plaintiffs Jack and Judy Harvey purchased their property "over 20 years ago," (Doc. 44, ¶ 86), which suggests approximately 2001 or 2002. Plaintiffs learned that their well water was contaminated with TCE from the Site in 2018, (Doc. 44, ¶¶ 81, 83), which impacts Plaintiffs in a variety of ways, including by causing health concerns and creating potential difficulty selling the properties.

The Second Amended Complaint asserts a single count of negligence, but the sole count is premised on two discrete theories, which allege that Defendants: (1) breached a duty to warn that TCE had spread into private wells when they learned that fact in 2004, (Doc. 44, ¶¶ 197, 200(1)), and (2) negligently performed their duties under the Consent Agreement and the Consent Decree, (Doc. 44, ¶ 200(2)). Additional details about Plaintiffs' claims will be discussed as necessary in Part II.[4]

Defendants seek dismissal, primarily contending that (1) Plaintiffs' failure to warn claims are preempted because they conflict with the 1993 Consent Agreement and (2) the negligence

---

[4] Plaintiffs seek certification of four classes, (Doc. 44, ¶ 163-67), but the Court need not discuss this aspect of the Amended Complaint. The Court similarly does not address the scope of relief to which Plaintiffs might be entitled.

3

claims should be dismissed because they fail to state a claim for which relief can be granted. Plaintiffs oppose dismissal. The Court resolves the parties' arguments below.

## II. DISCUSSION

Under Rule 12(b)(6), the Court "must accept as true all of the complaint's factual allegations and view them in the light most favorable to the Plaintiff[ ]." *Stodghill v. Wellston School Dist.*, 512 F.3d 472, 476 (8th Cir. 2008); *see also Alexander v. Hedback*, 718 F.3d 762, 765 (8th Cir. 2013).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations and citations omitted). A claim is facially plausible if it allows the reasonable inference that the defendant is liable for the conduct alleged. *E.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Horras v. American Capital Strategies, Ltd.*, 729 F.3d 798, 801 (8th Cir. 2013). Finally, dismissal based on an affirmative defense is permissible if the Complaint establishes that the defense exists. *E.g., C.H. Robinson Worldwide, Inc. v. Lobrano,* 695 F.3d 758, 763-64 (8th Cir. 2012).

### A. Failure to Warn and Conflict Preemption

Defendants argue that CERCLA preempts Plaintiffs' claims predicated on the alleged failure to disclose in 2004 that a private well was contaminated with TCE. This is not the first time the Court has addressed the issue of conflict preemption in this case. The Court discussed the issue in its Order addressing Defendants' Motion to Dismiss the First Amended Complaint,

4

which held that Plaintiffs' claims as pleaded were preempted but granted Plaintiffs an opportunity to file a Second Amended Complaint to assert theories that they had discussed at oral argument but had not clearly pleaded. Specifically, Plaintiffs were granted leave to more clearly state their failure to warn claim because while it had been alluded to in the Amended Complaint it was not clearly set forth as an independent theory of liability. (*See* Doc. 43, pp. 5-6, 15-16.)

The Court adopts its prior discussion about CERCLA preemption, (Doc. 43, pp. 7-12), in full and sets forth only a summary here. CERCLA encourages a responsible party to enter an agreement with the federal or state government to resolve the method for addressing a release of environmental contaminants. Such an agreement has the effect of federal law, and state laws (including state claims) that conflict with the agreement are preempted. The preemptive effect of such a settlement means that the settling party cannot be sued to require it to do something other than what is required by the settlement, nor can it be subjected to suit because the response called for by the settlement is inadequate. Therefore, claims for damages resulting from (1) actions required by a consent decree or (2) the failure to do more than is required/permitted by the settlement are also preempted.

This feature of CERCLA derives from 42 U.S.C. § 9622(e)(6), which provides that once an administrative order or consent decree is entered, "no potentially responsible party may undertake any remedial action" that is not authorized by the order or decree.[5] Courts uniformly interpret this provision as prohibiting the settling party from taking any remedial action not specified in the order or decree and hold that conflicting state claims are preempted. After

---

[5] Defendants contend the 1993 Consent Agreement is an "administrative order" within the meaning of § 9622(e)(6). (Doc. 47-1, p. 12.) Plaintiffs did not argue otherwise in their written arguments, but changed their position at the hearing. The Court need not resolve the issue at this time. If it is not an "administrative order," then § 9622(e)(6) does not apply and Plaintiffs' claims cannot be preempted; if it is an "administrative order," the analysis in this Order explains why Plaintiffs' are not preempted.

5

discussing cases construing and applying § 9622(e)(6), the Court concluded (and adheres to the conclusion) that Plaintiffs' claims are preempted to the extent that they seek:

1. equitable relief requiring Defendants to undertake "remedial actions" different from or in addition to those set forth in the settlements,
2. damages because Defendants failed to undertake "remedial actions" that were not required by the settlements, or
3. damages because Defendants did something required by the settlements, so long as there is not also a claim that Defendants performed that task improperly or negligently.

On the other hand, Plaintiffs' claims are not preempted to the extent that they:

1. allege that Defendants negligently performed the tasks required by the settlements, or
2. arise from Defendants' actions that were not required by the settlements.

The question now before the Court is whether publicly reporting the discovery of TCE in a private well in 2004 constituted a "remedial action" within the meaning of § 9622(e)(6). The Court concludes that public announcements and warnings are not "remedial actions" as defined by CERCLA, so § 9622(e)(6) does not preempt claims based on the failure to make a public announcement or warning.

As stated earlier, 42 U.S.C. § 9622(e)(6) provides that once an administrative order or consent decree is entered, "no potentially responsible party may undertake any remedial action" that is not authorized by the order or decree. The phrase "remedial action" is statutorily defined. The definition begins by stating that the phrase means "permanent remed[ies]" and "removal actions" designed "to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24). The definition then sets forth a lengthy list of examples,

6

and the listed items constitute means for storing, cleaning, removing, or preventing the spread of contamination. Thus, for instance, if an order or decree required a particular plan or method for "storage" or "confinement" of hazardous waste, the specified plan would constitute "remedial action" and the responsible party could not be held liable for using that plan or method or for failing to use a different plan or method. However, nothing in the definition of "remedial action" can be described as including public announcements about new discoveries of the spread of hazardous waste.

Defendants emphasize that the 1993 Consent Agreement dictates what Defendants were to do if new information (such as TCE's presence in private wells) was discovered: they were to notify MDNR. However, the fact that the 1993 Consent Agreement addressed the issue does not make those aspects of the settlement "remedial action" as defined in the statute.

Defendants direct the Court to several cases that purportedly support their position that warnings and announcements are within the scope of CERCLA preemption, but the Court concludes that they do not support that position.[6] They rely on *Bethas v. Midland Refining Co.*, 2000 WL 1920035 (D. Kan. Dec. 15, 2000), but the case does not address (or even cite) § 9601(24) or § 9622. The plaintiff in that case sued, among others, the federal government for failing to issue a public warning. The court concluded that the government's decision whether to issue a warning

---

[6] For their part, Plaintiffs cite *Chestnut v. AVX Corp.*, 2009 WL 10678827 (D.S.C. Mar. 25, 2009), but that case only addressed the nature of CERCLA preemption and not its scope. The issue decided was whether an assertion of CERCLA preemption caused the case to arise under federal law such that jurisdiction could be based on 28 U.S.C. § 1331. (The parties were not of diverse citizenship, so jurisdiction could not lie under 28 U.S.C. § 1332, as it does in the present case.) In that case the court simply held CERCLA did not preempt the field and CERCLA's conflict preemption was only a defense – and as a defense, the preemption argument did not appear in the well-pleaded complaint so it did not provide a basis for jurisdiction. *Chestnut*, 2009 WL 10678827, at *4-5; *see also Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) ("Thus, it is now settled law that a case may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue.").

7

is a discretionary function and thus cannot form the basis for a claim under Federal Tort Claims Act; preemption was not discussed. *Bethas*, 2000 WL 1920035, at *2-3.

Defendants also rely on *Salerno v. City of Niagara Falls*, 2020 WL 5814406 (W.D.N.Y. Sep. 30, 2020), *aff'd*, 2021 WL 4592138 (2d Cir Oct. 6, 2021), which (1) mentioned only in passing the plaintiffs' claim based on "repeated failures to alert the public at large" and (2) did not discuss § 9601(24). *Salerno*, 2020 WL 5814406, at *6. In affirming the decision, the Second Circuit also did not discuss § 9601(24) and did not mention the failure to warn claim. Further investigation reveals there was no specific discussion of the failure to warn claim in the plaintiffs' submissions to either the District Court or the Second Circuit, much less any discussion about whether warnings constitute "remedial actions" within the meaning of CERCLA.

Finally, Defendants point to the underlying complaint in *Bartlett v. Honeywell Int'l, Inc.*, 260 F. Supp. 3d 231 (N.D.N.Y. 2017), *aff'd*, 737 Fed. App'x 543 (2d Cir. 2018), which was dismissed on preemption grounds. But, while the Amended Complaint in that case included allegations about the defendants' failure to disclose certain information, none of the three counts asserted in the Amended Complaint were based on those facts. Moreover, the District Court's description of the claims analyzed in its decision does not include a failure to warn claim. *Bartlett*, 260 F. Supp. 3d at 238-39. Therefore, *Bartlett* did not address the issue presently before the Court.

Defendants also point to EPA regulations addressing community relations and communications with the public. 40 C.F.R. § 300.430(c). As Defendants concede, however, the EPA cannot expand the scope of the preemption set by Congress when it passed § 9622(e)(6) or declare actions as "remedial" if they do not satisfy the definition in § 9601(24). During the hearing, Defendants contended the EPA intended § 300.430(c) to interpret the phrase "remedial action." The Court does not believe this to be the case for several reasons. First, Congress defined remedial

8

activity when it passed § 9601(24).  Second, § 300.430(c) focuses on the community relation requirements created elsewhere in the regulation and contains no language suggesting it is interpreting § 9601(24) or § 9622(e)(6).  Third, even if the EPA intended to interpret the phrase "remedial action," it could not do so in a manner that is inconsistent with § 9601(24).  Community announcements and warnings do not fall within Congress's definition in that they are not actions intended "to prevent or minimize the release of hazardous substances so that they do not migrate" and are not similar to any of the examples Congress enumerated.  The Court does not believe the EPA could interpret § 9601(24) to include actions that are not described by Congress's definition or that are not like the examples Congress listed.  The 1993 Consent Agreement's requirement that Defendants notify MDNR is thus a floor, not a ceiling; it required Defendants to notify MDNR but did not preclude Defendants from reporting to MDNR *and* making a public announcement, so § 9622(e)(6) does not preempt a failure to warn claim.

As an alternative argument, Defendants contend a failure to warn claim is not viable because they immediately notified MDNR that TCE was discovered in a private well.  But they cite no statute supporting this argument, and the cases they cite do not hold that a failure to warn claim is not viable if the responsible party notified government officials.  Defendants rely heavily on *Kirk v. Schaeffler Group USA, Inc.*, 887 F.3d 376 (8th Cir. 2018), which, *inter alia*, affirmed liability for a responsible party based on a failure to warn theory.  In that discussion the Eighth Circuit stated: "Though [defendant] FAG Bearings argued that it had no knowledge of off-site contamination . . . there was evidence that [it] knew of on-site TCE contamination before the agencies did, and failed to warn the surrounding communities of potential risk."  887 F.3d at 393.  However, neither this statement nor anything else in the opinion holds that a government agency's knowledge of contamination precludes an action against the responsible party for failure to warn.

9

In context (and as confirmed by the briefs submitted to the Eighth Circuit), this comment was addressing FAG Bearings' argument that it could not be liable for a failure to warn because government agencies had already told the public about the TCE contamination so the public already had the information the plaintiffs' alleged FAG Bearings should have provided to them. It was in this context that FAG Bearings' knowledge of the contamination before the government's announcement was relevant; the Eighth Circuit did not hold that mere knowledge by the government was legally sufficient to terminate FAG Bearings' liability for failing to warn.[7]

Claims based on the choice of "remedial actions" set forth in administrative orders and consent decrees are preempted by CERCLA. However, notifying the public that contamination exists is not a "remedial action" within the meaning of CERCLA's preemption provision. Therefore, Plaintiffs' claims based on Defendants' failure to warn the public that TCE was found in private wells in 2004 is not preempted.[8]

---

[7] Defendants also contend that in *Cavallo v. Star Enterprises*, 100 F.3d 1150 (4th Cir. 1996), *cert. denied*, 522 U.S. 1044 (1998), "the Fourth Circuit allowed failure to warn claims to proceed only to the extent the defendant 'tortiously failed to notify the EPA.'" (Doc. 47-1, p. 16 (quoting *Cavallo*, 100 F.3d at 1157)). But this takes the quote from *Cavallo* out of context; in that passage the Fourth Circuit was addressing a different claim and stated that claims predicated on venting of petroleum tanks were "actionable if Star tortiously failed to notify the EPA of the releases . . . ." *Cavallo*, 100 F.3d at 1157. Elsewhere, in addressing the plaintiffs' failure to warn claim, *Cavallo* provides support for Plaintiffs' position here, stating that "failure by Star to notify the Cavallos of petroleum releases may support their claims if the . . . failures to notify were not authorized or approved by the EPA." *Id*. The Fourth Circuit remanded the case and, in so doing, reconfirmed "the fact that allegedly tortious conduct occurred within the temporal and subject-matter scope of an EPA Order does not necessarily compel preemption claim based on that conduct." *Id*. The case was remanded so the district court could determine, *inter alia*, whether anything in the EPA Order (1) forbade the defendant from notifying the plaintiffs about the releases or (2) authorized the defendant to refrain from notifying the plaintiffs about the releases. Consistent with *Cavallo*, the Court's conclusion in this case might be different if the settlements prohibited Defendants from telling the public they discovered TCE in private wells or authorized Defendants to keep such discoveries a secret – but this is not the case.

[8] As an alternative to their preemption argument, Defendants argue that they had no duty to warn because they had no reason to believe that the discovery of TCE in the private well in 2004 meant that the wells on Plaintiffs' property were contaminated. (Doc. 47-1, p.17.) However, the Second Amended Complaint alleges facts that suggest Defendants should have known of the possibility, particularly given that Plaintiffs' properties are closer to the Site than the well where TCE was found. (*See, e.g.*, Doc. 44, ¶¶ 69, 75, 80, 119, 199.)

## B. Negligent Implementation of the Remedial Actions

As stated earlier, § 9622(e)(6) would not preempt a claim alleging that Defendants negligently performed the remedial actions required in the settlements, and Plaintiffs have attempted to plead such a claim. Defendants argue that this theory should be dismissed for failure to state a claim, and the Court agrees that the Second Amended Complaint does not allege that (1) Defendants breached any duties or that (2) any supposed breaches proximately caused Plaintiffs' damage.[9]

"In any action for negligence, a plaintiff must establish the defendant owed a duty of care to the plaintiff, the defendant breached that duty, and the defendant's breach proximately caused the plaintiff's injury." *Wieland v. Owner-Operator Servs., Inc.*, 540 S.W.3d 845, 848 (Mo. 2018) (en banc). The Second Amended Complaint alleges that Defendants' settlements and agreements with the State imposed a duty of care, and one of the duties imposed was to "*perform all work required* . . . in accordance with all local, state, and federal laws and regulations . . . ." (Doc. 44, ¶ 153 (quoting Doc. 28-2, ¶ 47-2) (emphasis supplied); *see also* Doc. 47-2, § III.C (similar provision in 1993 Consent Agreement).) Plaintiffs further allege Defendants breached their duty to perform all work in accordance with applicable laws, as demonstrated by the fact that on several occasions MDNR advised that various "effluent limitations" had been exceeded. (Doc. 44, ¶ 154.) However, the mere fact that limits were violated does not plausibly demonstrate the limits were violated because Defendants negligently performed the remedial work required by the settlements (and the Second Amended Complaint does not identify any aspect of the remedial work that was performed negligently). The settlements did not serve as guarantees that the contamination would be

---

[9] Defendants also argue that this claim should be dismissed because, in allowing Plaintiffs to file a Second Amended Complaint, the Court did not specifically give Plaintiffs permission to re-plead this claim. However, the Court declines to dismiss this aspect of the negligence claim based on a lack of permission from the Court.

11

contained, and Defendants cannot be liable simply because their non-negligent performance of the remedial work required by the settlements was insufficient to prevent additional discharges that exceeded the effluent limitations. To hold otherwise would effectively eviscerate the preemption created by § 9622(e)(6).[10]

In addition, the Second Amended Complaint does not contain facts making it plausible that the violations set forth in paragraph 154 were the cause (much less the proximate cause) of the injuries Plaintiffs assert. Defendants argue, (Doc. 47-1, pp. 18-19), that the violations identified in the Second Amended Complaint did not involve TCE or private wells. Plaintiffs do not dispute the point and instead contend it does not matter because these violations demonstrate "general recklessness on Defendants' behalf [that] allowed contaminant concentrations to leave the Site." (Doc. 50, p. 14.) But the paragraphs Plaintiffs identify as supporting proximate cause, (*see* Doc. 50 p. 14), all (1) specifically relate to TCE, (Doc. 44, ¶¶ 119, 133-40) or (2) assert the legal conclusion (to which no deference is owed under Rule 12(b)(6)) that Defendants' actions were the proximate cause of Plaintiffs' injuries, (Doc. 44, ¶ 183, 201). And significantly, nothing about the violations makes it plausible that the violations Plaintiffs specified in paragraph 154 are related to the presence of TCE in Plaintiffs' wells or on Plaintiffs' property. To the contrary: the fact that none of the violations involved TCE might suggest the opposite.[11]

### III. CONCLUSION

The Motion to Dismiss, (Doc. 47), is **GRANTED IN PART** and Plaintiffs' negligence claims are dismissed to the extent that they are based on Defendants' negligent performance of

---

[10] The Court also does not agree with Plaintiffs that the fact effluent limits were exceeded, without more, sufficiently states the claim and allows them to engage in discovery to explore whether Defendants' negligent conduct caused the limits to be exceeded. A viable claim must be alleged before discovery is permitted.

[11] Plaintiffs also point to two violations for which details are presently unknown. (Doc. 50, p. 14 (citing Doc. 44, ¶¶ 155-56).) However, the mere existence of violations does not make it plausible that those violations are examples of negligent conduct by Defendants or were the proximate cause of contamination on Plaintiffs' properties.

duties under the settlements. However, the Motion to Dismiss is **DENIED** to the extent that Plaintiffs' negligence claims are predicated on Defendants' failure to warn the public that TCE was discovered in private wells.

**IT IS SO ORDERED.**

**DATE**: August 31, 2022

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
UNITED STATES DISTRICT COURT